Commonwealth *vs.* Lamory Gray.

Suffolk. September 9, 2011. - November 15, 2012.

Present: Ireland, C.J., Spina, Cordy, Duffly, & Lenk, JJ.

*Homicide. Firearms. Practice, Criminal,* Capital case. *Identification. Evidence,* Identification, Grand jury proceedings, Impeachment of credibility, Photograph, Relevancy and materiality. *Witness,* Impeachment.

At a murder trial, the judge clearly erred in precluding the admission in evidence, for impeachment purposes, of a portion of the grand jury testimony of an unavailable witness, in which the witness, when asked to identify the shooter of the victim, selected a photograph other than the defendant's, where, given that the witness's hearsay statement identifying the defendant was admitted at trial, his credibility properly could have been attacked by his grand jury testimony to the contrary; further, where identification of the shooter was the key issue at trial, misidentification was the theory of the defense, and the prosecutor relied heavily on the witness's hearsay statement identifying the defendant, this court could not say that the error was harmless beyond a reasonable doubt, and a new trial was required. [745-750]

At a murder trial, the judge erred in admitting in evidence, as prior acts of identification, a series of photographs on which an eyewitness to the murder had written statements to the effect that the individuals depicted had no involvement in or had not witnessed the crime, where the photographs and the witness's statements were not relevant to establish any fact at trial and served merely to confuse the jury [750-752]; further, the witness's testimony concerning her introduction to the defendant months after the shooting, and her resulting ability to identify the defendant at trial and in a photograph, was of marginal relevance at best and was more prejudicial than probative [752].

At a murder trial, the judge committed prejudicial error by admitting a rap music video as evidence of the defendant's gang membership and motive to commit the crime, where the video was minimally if at all probative, given that the defendant had not otherwise contested that he was a gang member, the video contained no direct evidence of the defendant's gang allegiance or motive or intent at the time of the murder, and there was no basis on which any witness properly could offer an expert opinion on the meaning of the video as a pledge of gang allegiance, the reason for which it was ostensibly admitted; and where the prejudicial effect of the video's lyrics and imagery was overwhelming. [752-757]

Indictments found and returned in the Superior Court Department on December 5, 2007.

The cases were tried before by *Frank M. Gaziano*, J.

*Robert F. Shaw, Jr.*, for the defendant.

*Kris C. Foster*, Assistant District Attorney (*Craig F. Iannini & Masai-Maliek King*, Assistant District Attorneys, with her) for the Commonwealth.

Lenk, J. A Superior Court jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation, and of two firearms offenses. On appeal, the defendant claims error in a number of respects. Because we conclude that certain pivotal evidentiary rulings implicating identification were erroneous and not harmless beyond a reasonable doubt, a new trial is required.

*Introduction.* The essential facts surrounding the shooting death of Herman Taylor are not in dispute. Around 5:30 P.M. on July 12, 2006, minutes after eighteen year old Taylor left his home in the Roxbury section of Boston, he was approached by a man wearing a hooded "Champion" sweatshirt (hoodie). They engaged in what appeared to bystanders to be an animated conversation, until the hooded figure, whose face was partially obscured, pulled out a gun and shot Taylor multiple times, chasing him and shooting as Taylor ran from him in a futile attempt to escape. The hooded figure then fled, and Christopher Jamison, who had been in an automobile driving past, ran to the victim's aid. Later that evening, without having identified his assailant, Taylor died of his wounds.

Bystanders provided little by way of description of the shooter, no useable forensic evidence was discovered, and the murder weapon was never found. Video surveillance cameras in the area showed the hooded figure, whose face was not visible, arriving a block away from the scene of the shooting in a white Nissan Maxima automobile with a missing hubcap, which dropped him off and drove away. The vehicle's registration plates could not be discerned. Little progress was made in learning who murdered Taylor until, in March, 2007, police were provided information by Jamison, whom they were questioning in connection with a different matter. Jamison disclosed that he and several women had been driving past the shooting as it unfolded.

Approximately five months later, a grand jury were convened and heard testimony from, among others, Jamison; the women

who had been with him in the vehicle — his then girl friend Shagara Williams, who was driving, and her friends Shumane Garvin and Danielle Canty; and the cousin of the owner of a white Nissan Maxima. The defendant was arrested on October 26, 2007. On December 5, 2007, the grand jury handed down indictments charging him with murder in the first degree, G. L. c. 265, § 1; possession of a firearm without a license, G. L. c. 269, § 10 (*a*); and possession of a loaded firearm, G. L. c. 269, § 10 (*n*).

The defendant grew up in the Bromley-Heath housing development, an area of Boston that the Heath Street gang claimed as its territory. The location of the shooting, on Humboldt Avenue in the Roxbury section of Boston, was known as territory belonging to the rival H-Block gang. During the year before the shooting, there had been fifty to sixty firearm "incidents," including several homicides, in the combined H-Block and Heath Street areas. The Commonwealth's theory at trial was that the defendant, as a member of the more than two-hundred-person Heath Street gang, mistakenly took Taylor to be a member of the approximately fifty-person H-Block gang and, as part of an ongoing feud between the two gangs, shot and killed him. To prove that this was the defendant's motive for shooting Taylor, the Commonwealth introduced over objection extensive testimony about both gangs, prior incidents of violence in the vicinity of the shooting, the defendant's purported membership in the Heath Street gang, and also evidence that Roosevelt Wilkins, the owner of a Nissan Maxima resembling that which transported the shooter, was a Heath Street member, a friend of the defendant, and not at work on the day of the shooting.

To prove that it was the defendant and not another Heath Street gang member who shot Taylor, the Commonwealth relied on the identification of the shooter made by occupants of Williams's vehicle while they were driving past. In addition to Williams's statement that she recognized the defendant, there was testimony that Jamison, a member of H-Block, had identified the defendant as the shooter. Jamison himself was not available to testify at trial, and his identification of the shooter was put before the jury through Williams's testimony. Such testimony, however, was materially at odds with what Jamison

had said before the grand jury. The defendant was not permitted to introduce any portion of Jamison's contrary grand jury testimony, including Jamison's failure to select the defendant's photograph from a photographic array shown to him before the grand jury. No other witnesses identified the defendant as the shooter. The defense was misidentification.

The defendant was convicted of murder in the first degree on a theory of deliberate premeditation, and of both firearms offenses. On appeal, he claims error chiefly in five respects, challenging (1) key evidentiary rulings concerning identification and related testimony; (2) the admission of a rap music video (rap video) in which the defendant appeared; (3) the admission of police expert testimony on gangs and the expert's description of the defendant as a gang member; (4) an adverse ruling during the defendant's closing argument that precluded him from calling into question Jamison's credibility and reliability; and (5) assorted improprieties in the Commonwealth's use of grand jury and opinion testimony, as well as in its closing. He also requests that we exercise our power under G. L. c. 278, § 33E, to reduce the murder conviction to a lesser degree of guilt or, in the alternative, to grant him a new trial. Because we conclude that it was error to preclude the defendant from impeaching Williams's testimony as to Jamison by introducing Jamison's contrary grand jury testimony, to permit irrelevant and prejudicial identification testimony concerning certain photographs, and to allow admission of the prejudicial rap video, the convictions must be reversed.[1]

*Background.* 1. *The grand jury proceedings.* Because of its importance to the issues on appeal, we summarize relevant portions of the testimony given in connection with a grand jury investigation that began in September, 2007.[2]

*Shagara Williams.* Williams, then eighteen years old, was the

---

[1]Because of the result we reach, we need not address the defendant's other claims of error, including those pertaining to other gang-related evidence.

[2]Given the extensive use of grand jury testimony at trial, the importance of that testimony to the Commonwealth's case, the Commonwealth's assertions that Christopher Jamison's other grand jury testimony would have supported its case, and the critical nature of impeachment testimony that was not admitted, we have allowed the defendant's motion to expand the record to include all of Jamison's testimony, as well as certain portions of other witnesses'

first percipient witness to testify. During her testimony on September 7, she said she was unable to identify either the victim or the shooter. As they were driving on Humboldt Avenue, with her behind the wheel, Jamison saw someone he recognized, seemed surprised, and said, "Yo. Let me out the car. There goes that nigger Lawz."[3] She replied, "Who's that?" and Jamison answered, "That nigger from Heath Street," whom he also identified as "Lamory." Although she had never seen him, she knew the name "Lamory" as someone from Heath Street. Williams did not see the shooting. As Jamison was getting out of the vehicle, the back seat passengers, Canty and Garvin, were "talking about the boy falling down or getting shot or something."

*Christopher Jamison.* Jamison, then twenty-two years old, first testified before the grand jury on September 13, 2007. He telephoned Williams late in the afternoon of July 12, 2006, to pick him up and take him to the store. They were driving on Humboldt Avenue and he was in the front passenger seat, preparing marijuana for smoking, when Williams said, "[T]here go your mans right there." He looked up, recognized Taylor, and saw the hooded figure, whom he did not recognize, standing on the sidewalk. Taylor walked past the hooded figure and then turned around and started talking to him. Because the two men were just talking, Jamison returned his attention to preparing his marijuana. He heard shots fired, Williams and Garvin started screaming, and then both said, "[O]h, my God, he shot him." Jamison saw Taylor running, with the "guy with the hoodie" a few feet behind, chasing him. He heard several more shots and saw Taylor fall at the corner of Ruthven Street and Humboldt Avenue. He demanded that Williams pull over and then leaped from the vehicle and ran to help Taylor.

Later that day, Williams and Garvin again picked Jamison up

---

grand jury testimony. We have allowed also the Commonwealth's motion, opposed by the defendant, to expand the record to include all the grand jury testimony. We note, however, that only small portions of such testimony — primarily those introduced at a voir dire on the second day of trial — were ever made available to, or summarized by counsel to, the trial judge, who did not have before him the pivotal testimony of Jamison.

[3]For consistency, we use the spelling "Lawz," although the nickname was also transcribed at times as "Laws."

in Williams's vehicle, and Williams said that she thought the shooter had looked like "Lawz." Jamison knew the name "Lawz" as being someone from Heath Street, but had not "seen the face" before that day. He was "kind of shock[ed]" that Williams, whom he was dating, would have been able to recognize Lawz. After that day, Jamison stopped speaking to Williams.

Subsequently, Jamison saw a man referred to as "Lawz" when they were both incarcerated in separate wings of the Suffolk County house of correction; the person was pointed out to him as "one of those Heat kids." The individual had "brown" skin and "a small Afro."[4] Because the units were kept apart, he only saw the individual "a couple times" through a connecting glass door to the medical unit. A few days before his grand jury appearance, Jamison saw the man on the court house steps, when they were both reporting to their parole officers. They shook hands; Jamison said that he had never had a "problem" with him, and they agreed that they wanted to put all the trouble between the Heath Street and H-Block gangs behind them.

At that point, having been advised of it by the prosecutor, Jamison invoked his right to an attorney. Jamison returned to testify before the grand jury again on October 5. He identified a photograph that he had selected from a police photographic array containing the defendant's photograph as the person identified to him as "Lawz"; the photograph he selected was not the defendant's.

*Danielle Canty and Shumane Garvin.* Canty, then nineteen years old, and Garvin, who had just turned eighteen, appeared before the grand jury on October 10, five days after Jamison's second appearance, and each stated that she was unable to identify the shooter. Canty testified that she had seen two teenaged males about seventeen or eighteen years old facing each other. She had turned to face forward because "it didn't look like anything was happening," when the man in the front seat said, "Oh, shit." She turned around and saw the man in the hoodie,

---

[4]At trial, in the photograph used for identification, and, according to witness testimony, at the time of the shooting, the defendant had long hair, parted in the middle and tightly braided in thin braids ending at his shoulders, and a moustache. Asked whether his appearance at trial differed, Williams said that she had not previously seen the defendant wearing glasses.

holding a gun, shooting and chasing the other man. Garvin heard arguing and saw "two dudes yelling, face to face," after which it appeared that they had resolved the argument because they seemed ready to shake hands. She heard a gunshot as "Shagara and Chris said, 'That looks like Law[z].' "[5] After Jamison jumped out, Williams drove away, "scared, panicking."

*Shagara Williams (second appearance).* Two days after Canty and Garvin testified, and more than a month after her first appearance, Williams appeared again before the grand jury and testified that she had not been entirely "accurate" at her first appearance. This time, she said that when Jamison exclaimed, "Yo, there goes Lawz," she "glanced" over and saw two men facing each other on the sidewalk, seeing their faces from "the

---

[5]The prosecutor clarified:

> *Q.*: "Did they say that at the same time?"
>
> *A.*: "Like they said, 'What's he doing over this way?' "
>
> *Q.*: "Who said that, Shagara or Chris?"
>
> *A.*: "Chris said, 'What's he doing over here.' And Shagara said, 'That looks like Law[z].' "
>
> *Q.*: "When they said that, did you know who they were referring to?"
>
> *A.*: "Not at that time."
>
> *Q.*: "You had never met Law[z] before that?"
>
> *A.*: "No."
>
> *Q.*: "Did they mention any other name at that point?"
>
> *A.*: "No."
>
> *Q.*: "When they said, 'That looks like Law[z],' did you know who they were referring to of the two guys?"
>
> *A.*: "No."

The questioning continued:

> *Q.*: "So he looked back to his right. And that's when Shagara and Chris said he looked like Law[z]?"
>
> *A.*: "Yeah."
>
> *Q.*: "They said that at the same time[?] Or is that when Chris said, 'That's Law[z],' and Shagara said, 'Yeah, it looked like Law[z][?]"
>
> *A.*: "Yeah. Just like that."

side." She recognized Lawz, but said, "Who?" because she was "shocked" that "Lawz was on Humboldt" since he was from Heath Street. Williams kept driving, not looking further at the sidewalk, and "people in the back were telling [her] that one of the boys was falling down." Contrary to her earlier testimony that she only knew the name "Lawz" as being someone from Heath Street, she said that she had seen Lawz "regularly" several years before, when she was dating someone else from Heath Street. She identified a photograph of the defendant on which she had written "known to me as Lawz and arguing with another boy."

*Bystanders unloading groceries.* Jeisy Guerrero, seventeen, a bystander who had been unloading groceries within a car length of the shooter, appeared on September 14. Guerrero saw the man in the hoodie arguing with Taylor for several minutes and then saw him shooting. She described the shooter as approximately twenty years old, with a mustache and hair that "wasn't like a clean cut . . . it wasn't an Afro, but it was like it was growing. He cut it but it was growing in." Guerrero identified a photograph from a photographic array as one that "kind of looked like" the shooter, and she wrote on the back, "He looks like the person who killed Herman." The photograph she selected was not the defendant's. Three other bystanders who were unloading groceries with Guerrero were able to identify the shooter as "black" but otherwise could describe only his clothing.

2. *Voir dire of gang expert.* The prosecutor moved in limine to have Boston police department Detective James Sheehan qualified as a gang expert, in order to opine both that a feud existed between H-Block and Heath Street and that the defendant was a member of the Heath Street gang. The prosecutor sought also to introduce a rap video, in which the defendant appeared, as evidence of his gang membership. The defendant moved to exclude all gang evidence. On the day before trial, to determine the bases of Sheehan's knowledge, whether he was qualified to offer the expert opinions, and the relevance of the video, the judge conducted an extensive voir dire of Sheehan; among other evidence, more than fifty police reports, fourteen "field interrogation, observation, frisk and/or search" (FIO)

reports,[6] a number of jail incident reports, a copy of the Boston police department gang database, and a copy of the rap video were introduced.

Sheehan testified to the existence of an ongoing feud between H-Block and Heath Street from April, 2004, through July, 2006, based in large part on police incident reports prepared by others concerning investigations in which he had not participated, and also on his own interactions with unnamed H-Block and Heath Street members from 2005 to 2006. The judge concluded that Sheehan was qualified to give expert testimony on the existence of the feud because he had interviewed Heath Street and H-Block members who acknowledged it and had direct knowledge of a truce between the two groups, and because the "patterns of shooting incidents" in the police reports "demonstrate[d] the longstanding dispute."[7]

As to his opinion that the defendant was a member of Heath Street, Sheehan presented the Boston police department's definition of a gang and the criteria police rely on to establish gang membership.[8] Sheehan concluded that the defendant was a Heath

---

[6]Unlike police incident reports, which are generated when police respond to a reported crime, a Boston police department "field interrogation, observation, frisk and/or search" (FIO) report is created when police have an interaction with a member of the community, or when they make certain observations of people in the community. According to Boston police department policy, a FIO report is to be created whenever an officer sees a person in the company of someone the officer knows to be a gang member, regardless of whether the officer has any interaction with that person.

[7]The judge ruled that the jury could consider gang evidence only for the limited purpose of establishing motive. The defendant objected and sought a continuing objection at trial, which the judge allowed.

[8]Sheehan testified that, with the exception of self-admission, which alone is sufficient, Boston police will enter an individual in the gang database if two or more of the following criteria are met:

> "[I]f they're identified as a gang member by a parent or a guardian; if they are arrested for any criminal offense with a known gang member; if they're identified with a known gang member on more than two occasions; if a confidential informant indicates an individual is in fact a gang member; if a confidential informant who has untested reliability indicates a person is a gang member and it's then further corroborated; as well as any physical evidence, such as photographs, documents, reports; and if an individual frequents a particular area associated with that gang and may begin wearing particular clothing, certain colors, exhibiting hand gestures or signs, if they're applicable to a certain gang."

Street gang member based on his observation of the defendant in the company of known gang members, the fact that the defendant "lived in or frequented" an area known to be a gang territory, the fact that the defendant's name was in the gang database, unspecified information from a confidential informant, and the observations of other police officers as documented in their FIO reports.[9] The judge ruled that Sheehan was qualified to offer an expert opinion on the defendant's membership in Heath Street because he had "observed the defendant numerous times with other Heath Street gang members," because there were "a number" of FIO reports, and because the judge took "note of the defendant's appearance in this gang rap video, professing his membership in Heath Street."

The prosecutor sought also to introduce a rap video entitled "Heat Life, Nothing But a P Thang," in which the defendant appeared, as evidence of the defendant's membership in Heath Street. He argued that the video, downloaded by police from an Internet site, was the defendant's statement "pledging allegiance" to the Heath Street gang. Sheehan did not know who wrote or produced the video, the names of the main performers, or which officer had downloaded it. He "believed" that the video was made in either 2005 or 2006. Although Sheehan recognized only "a few" people in the video, and could not state if any of the others were involved in Heath Street, he said that the video "consists of discussing being a Heath Street gang member and what takes place or what's done or conducted by individuals who are Heath Street gang members,"and that "Heat Life" was a "reference to Heath Street gang members." He was not asked any questions about his knowledge of rap music. The video was ordered excluded as being more prejudicial than

[9]Sheehan had seen the defendant in the company of individuals police considered to be members of three different gangs approximately a dozen times, from 2004 to the time of the shooting, but had not written FIO reports on any of those observations. The defendant was never seen wearing Heath Street clothing, had no gang tattoos, and told police that others believed he was a Heath Street member because of where he lived. He did not identify himself, nor had any parent or guardian identified him as being, a gang member. However, there were eleven FIO reports indicating that other officers had seen the defendant in the Heath Street area with members of three different gangs, and his name appeared in the Boston police department gang database.

probative, unless the defendant disputed his membership in Heath Street.

3. *Trial.* a. *Identification evidence.* Jamison was unavailable at trial because he asserted his privilege against self-incrimination pursuant to the Fifth Amendment to the United States Constitution. However, Jamison's reported identification of the defendant as the shooter ("there goes Lamory") was introduced through the testimony of Williams and Garvin. The defendant's repeated motions to introduce Jamison's nonidentification of the defendant before the grand jury were denied.

Garvin said that she heard, then saw, the man in the hoodie arguing with another man; Williams made a statement; and then she and Williams heard gunshots. Garvin testified, contrary to her grand jury testimony, that she and Canty ducked down when the shots were fired and sat up as Williams was pulling over to let Jamison out. Consistent with the judge's ruling at an earlier voir dire,[10] virtually all of Garvin's grand jury testimony about the events immediately surrounding the shooting was then introduced substantively by the prosecutor and another assistant district attorney reading the grand jury minutes.

The prosecutor was permitted also to admit various statements of identification by Garvin. Garvin testified that, on her birthday in September, 2006, her brother introduced her to one of his friends who was known as "Lawz"; she did not recognize the man. Garvin identified the defendant in the court room as the person to whom she had been introduced as "Lawz," and

---

[10]The prosecutor moved to admit all of Garvin's grand jury testimony and three photographs she had identified in September, 2007. On the second day of trial, a hearing was conducted to determine her present memory of the shooting and whether she was able to identify the defendant as the shooter. She testified at the voir dire, contrary to her grand jury testimony, that she ducked when the shots rang out. The judge concluded that if she testified similarly at trial, her grand jury testimony could be introduced substantively since she asserted no memory of certain events to which she had testified previously, but that it would have to be done "question by question."

The judge determined also that Garvin had been unable to identify the shooter. Although the prosecutor agreed that Garvin did not recognize either the victim or the shooter on the day of the shooting, he argued, "[I]n response to my questioning, she begins to use the name 'Lawz.' And then — and she continues to do that." The judge ruled that Garvin was merely adopting the prosecutor's words, and if her grand jury testimony were admitted, her use of "Lawz" when referring to the shooter would be replaced by "the shooter."

also identified three photographs, one of them the defendant's, that she had selected a year later from a group of eight shown to her by police shortly before her October 10, 2007, appearance at the grand jury.[11] Over repeated objection and following several sidebar conferences, Garvin responded to the prosecutor's questions concerning what "was going through her head" when she was introduced to "Lawz" by saying that she recognized the name "Lawz" as having been used in William's vehicle on the day of the shooting.

Canty, the other back seat passenger, testified that she had little memory of the events of July 12, 2006, almost three years earlier. She testified, inconsistent with her grand jury testimony, that her attention was drawn to a group of people standing on the sidewalk when "someone" in Williams's vehicle recognized "someone on, like, the street." She only looked over because "they said 'there goes,' " and could not remember that anything else had happened outside the vehicle until after the man got out. Although no voir dire of Canty was conducted, and no ruling made as to her memory, most of her testimony about the shooting consisted of having Canty read aloud her grand jury minutes in response to the prosecutor reading aloud the questions he had put to her at the grand jury.

Williams testified at trial, as she had at her second appearance before the grand jury, that she heard Jamison exclaim, "There goes Lawz" or "There goes Lamory," glanced over briefly, and recognized the man in the hoodie as "Lamory." Although Williams was not impeached with any of her grand jury testimony, significant portions of that testimony were read into evidence and then rephrased by the prosecutor, after Williams's review of the minutes did not refresh her recollection of particular details of her statements before the grand jury.

An automobile damage appraiser testified that, at the time of the shooting, Wilkins (whom Sheehan had identified as a Heath Street gang member and friend of the defendant) had owned a white Nissan Maxima with a missing rear passenger's-side hubcap; the vehicle was sold approximately six months later.

---

[11]The three photographs, annotated on the back with Garvin's handwritten comments, were introduced in evidence over objection. See discussion, part 2, *infra*.

The owner of a restaurant on Cape Cod where Wilkins worked testified, based on employee timecards, that Wilkins had not worked on the day of the shooting. Video recordings from security cameras on nearby buildings were described by Boston police Sergeant Detective William Duggan, the lead homicide investigator, entered in evidence, and played for the jury. Duggan pointed out the similarities between the vehicle circling the area and dropping off the shooter and Wilkins's Nissan Maxima, particularly its missing hubcap.

Duggan also testified regarding the defendant's statement to police immediately after his October 26, 2007, arrest, which was not recorded. Initially, the defendant asserted that, following his release from incarceration on July 6, 2006, six days before the shooting, he had spent time with a former girl friend in Rhode Island. When questioned further after he was unable to provide the girl friend's current address or telephone number, the defendant said that he had lost touch with her while he was incarcerated, had spent the days following his release from prison "drunk and high" with two of his childhood friends, and could not remember much about that period.

b. *Gang evidence.* Sheehan testified as an expert on the Boston police department criteria for gang membership, the existence of the feud between Heath Street and H-Block, and the defendant's gang membership. He also introduced a copy of the gang database and identified photographs of the defendant's friends from that database, among them Wilkins, as known Heath Street members. Although the defendant denied being a member of Heath Street, and no parent or guardian had identified him as such, the defendant otherwise met all the criteria for gang membership. Based on the judge's ruling that the rap video would be excluded if the defendant did not challenge gang membership, counsel did not cross-examine Sheehan on the bases of his opinions.

c. *Rap video.* The judge again declined to allow admission of the rap video after the prosecutor solicited testimony from Duggan that, following his arrest, the defendant denied being a gang member but said that others thought he was one because of where he lived. Subsequently, however, the judge allowed the prosecutor's motion to admit both the video and a number of

still photographs of the defendant derived from the video[12] as rebuttal evidence because the defendant had "opened the door" and challenged gang membership in his cross-examination of Duggan.[13] The video was identified and introduced by Duggan, who testified that it was posted on the Internet in 2005. He did not know who wrote or produced it, and could not identify the lead performers. The only thing he knew about rap music was hearing it "when my kids are in the car."

The video depicts approximately ten to twelve people, generally in a group rapping in the background, with one or two rappers in the foreground. The defendant appears in the background in a number of scenes, and in the foreground in a few others. The individuals in the video are not wearing the colors or insignia of the Miami Heat basketball team (which Sheehan described as Heath Street clothing), and the lyrics do not mention the Miami Heat or Heath Street. However, in a number of scenes, performers are wearing typical "gangsta" clothing,[14] and in a few scenes, some rappers, including the defendant, wear bandanas tied over the lower part of their faces. While the video does not show the defendant pledging his "allegiance" to the Heath Street gang, it is replete with words and images that appear to glorify violence ("we have pills, perps, pistols and powder. It's a P-Thang"), and the main rapper at times holds his hand as though it were a gun.

d. *Closing argument.* In his closing, the prosecutor relied heavily on Jamison's reported statement identifying the defendant. He suggested repeatedly, and contrary to the judge's explicit restrictions, that Garvin and other witnesses had recognized the defendant as the shooter.[15] He argued that the video showed the

---

[12]The prosecutor introduced each photograph by asking Duggan to point out the defendant's location in the photograph and to describe his clothing.

[13]Counsel asked Duggan whether the defendant's photograph in the gang database was taken on the day of his arrest in October, 2007. Counsel maintained that he asked the question in an effort to distinguish the defendant's appearance in the photograph and his disheveled hair on being awoken by police, which was more like the description of the shooter as having a short Afro than the braids the defendant wore in July, 2006, and at trial. On redirect examination, the prosecutor elicited testimony that Boston police update the photographs in the gang database every time an individual in the database is arrested.

[14]See discussion of "gangsta rap," notes 22-24, *infra.*

[15]The judge sustained an objection to one such comment.

defendant pledging allegiance to Heath Street, and that anyone who was a member of Heath Street had a motive to kill Taylor:[16]

"And you know the defendant was part of Heath Street because he did admit it. He admitted it when you saw him on that 'Heat Life' video, ladies and gentlemen. And you have those stills here before you. When there's nobody around, there's no court, there's no police officers and you see the defendant, you saw him pledging his allegiance to Heath Street. Detective Sheehan told you that one of the nicknames for Heath Street is 'Heat Life.' And that's all that he pledges on that video, 'Heat Life.' "

"And, as a Heath Street gang member, ladies and gentlemen, this defendant had the motive to kill Herman Taylor because this was about where the shooting occurred, not who the victim is. . . ."

*Discussion.* 1. *Grand jury identification testimony by unavailable witness.* The judge denied the defendant's repeated motions, both before and during trial, to admit Jamison's identification testimony before the grand jury in which, when asked to identify Lawz, he selected a photograph other than the defendant's. The judge concluded that substantive admission of Jamison's nonidentification would be an impermissible extension of *Commonwealth* v. *Cong Duc Le*, 444 Mass. 431, 435-442 (2005).

The defendant maintains that the evidence was admissible substantively, was exculpatory, and went to the heart of the central issue at trial — identification of the shooter. See *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 796 (2009), quoting *Commonwealth* v. *Jones*, 423 Mass. 99, 109 (1996). He argues in the alternative that Jamison's nonidentification was in any event admissible for impeachment purposes. See Mass. G. Evid. § 806 (2012).[17] See also *Commonwealth* v. *Mahar*, 430

---

[16]"You know that Roosevelt Wilkins was driving his car on the night of the murder, that white Nissan Maxima. And you know it because Roosevelt Wilkins is part of Heath Street. And, because he's part of Heath Street, he's part of that war with H-Block."

[17]Section 806 of the Massachusetts Guide to Evidence (2012) states:

"When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be sup-

Mass. 643, 649 (2000). He contends that his inability to challenge Jamison's purported identification deprived him of a critical ground of defense and violated his constitutional rights to due process, a fair trial, and confrontation of the witnesses against him. See *Commonwealth* v. *Silva-Santiago, supra* at 796-797 & n.20 (2009); *Commonwealth* v. *Martin,* 447 Mass. 274, 293 & n.4 (2006) (Cordy, J., dissenting) ("There is no longer any doubt that mistaken eyewitness identification is the primary cause of erroneous convictions, outstripping all other causes combined"; seventy-seven per cent of wrongful convictions where defendant was exonerated through use of deoxyribonucleic acid [DNA] evidence were "product of mistaken eyewitness identifications").

We need not reach the question whether, in these circumstances, Jamison's testimony was also admissible substantively,[18] because it was clear error to preclude the defendant's use of

ported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination."

[18]In *Commonwealth* v. *Clemente,* 452 Mass. 295, 312-315 (2008), cert. denied, 555 U.S. 1181 (2009), we stated that, when a witness who testified before the grand jury is unavailable at trial, the witness's grand jury testimony is admissible as substantive evidence if "the party seeking the admission of the grand jury testimony can establish that the Commonwealth had an opportunity and similar motive to develop fully a (now unavailable) witness's testimony at the grand jury." See Mass. G. Evid. § 804(b)(1) (2012). A determination whether there was opportunity and similar motive is fact specific and dependent on the particular circumstances. See *United States* v. *McFall,* 558 F.3d 951, 961 (9th Cir. 2009), citing *United States* v. *Salerno,* 505 U.S. 317, 325 (1992) (under Fed. R. Evid. 804[b][1], "[p]rosecutors need not have pursued every opportunity to question [the witness] before the grand jury; the exception requires only that they possessed the motive to do so"). While we have observed that "[i]t is likely to be very difficult for defendants offering grand jury testimony to satisfy the 'opportunity and similar motive' test," *Commonwealth* v. *Clemente, supra* at 315, quoting *United States* v. *Omar,* 104 F.3d 519, 523 (1st Cir. 1997), the circumstances here may well satisfy that requirement. Cf. *Commonwealth* v. *Sineiro,* 432 Mass. 735, 743 n.9 (2000).

Jamison appears to have been the Commonwealth's key witness before the

Jamison's grand jury testimony, as requested, for impeachment purposes. Notwithstanding the Commonwealth's contentions to the contrary,[19] we agree that the evidence was plainly admissible for this purpose, and that the defendant preserved his objection to its exclusion. The identification of the defendant by Jamison was pivotal to establishing the identity of the shooter. Yet, Jamison did not testify at trial, and his purported identification of the defendant was admitted at trial through statements

grand jury. His description of the events was corroborated by third-party witnesses, including police officers, and physical evidence such as security video recordings. At the time of his non-identification of the defendant's photograph, Jamison's identification of the shooter was critical. See *Commonwealth* v. *McCarthy*, 385 Mass. 160, 162 (1982). Williams had testified at that point that she did not recognize the shooter, that Jamison recognized the shooter and called out the name "Lamory," and that she only knew the name "Lamory" as being someone from Heath Street. Guerrero, who stood near the shooter for several minutes, identified a photograph of the person she thought "looked like" the shooter; that photograph was not the defendant's. The other three witnesses unloading groceries had been unable to identify anyone.

Thus, at the time Jamison identified someone else as "Lamory," the Commonwealth had offered no other identification of the defendant. Contrary to the Commonwealth's argument that the prosecutor had "no motive to examine Jamison further" after he failed to identify the defendant's photograph because of the "obvious falsity of Jamison's misidentification," the prosecutor, lacking any other identification witness, would appear to have had a motive to prove the falsity of the Commonwealth's key witness's identification of someone other than the defendant.

[19]The Commonwealth asserts that there was no abuse of discretion in declining to admit the evidence for impeachment purposes because the judge never faced this question. According to the Commonwealth, the defendant sought only to introduce the evidence substantively, and this decision was likely strategic, since counsel would not have wanted the Commonwealth to introduce other portions of Jamison's grand jury testimony. Having reviewed the defendant's motion to "challenge" the identification, the hearing transcripts, and other documents in the record, we are satisfied that the defendant sought to introduce the evidence for impeachment purposes.

The Commonwealth argues also that the nonidentification evidence was properly excluded because the prosecutor would have been able to rebut it with other grand jury testimony of Jamison. Had the nonidentification evidence been introduced, the prosecutor would certainly have been free to offer such evidence. See *Commonwealth* v. *Seng*, 456 Mass. 490, 498-499 (2010); *Commonwealth* v. *Tennison*, 440 Mass. 553, 563 (2003), quoting *Commonwealth* v. *Carmona*, 428 Mass. 268, 272 (1998). However, the transcript of the grand jury proceedings also contains other evidence that supports Jamison's nonidentification of the defendant, including his statement that he did not recognize the shooter at the time and that he had never seen the person named "Lawz" until months after the shooting.

by Williams, in part by introduction of her own testimony before the grand jury.[20]

"When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked . . . by any evidence which would be admissible for those purposes if the declarant had testified as a witness." Mass. G. Evid. § 806 (2012). See *Commonwealth* v. *Mahar*, 430 Mass. 643, 649 (2000). When Jamison's hearsay statement was admitted at trial, its credibility could properly have been attacked by his grand jury testimony to the contrary. Had Jamison been available to testify at trial, he could have testified, consistent with such grand jury testimony, that he did not recognize the shooter, that he had not met the defendant before the shooting, and that, when asked to identify "Lamory Gray, also known as Lawz," he selected a photograph other than the defendant's. Such testimony would have countered Williams's version of what Jamison said while in her vehicle.

Moreover, given the critical nature of a defendant's ability to impeach an identification witness, see *Commonwealth* v. *Vardinski*, 438 Mass 444, 450 (2003), quoting *Commonwealth* v. *Johnson*, 420 Mass. 458, 465 (1995) (" 'whenever eyewitness testimony is introduced against an accused,' we 'require the utmost protection against mistaken identification' "), the exclusion of this evidence raises significant due process concerns. Where "identification was an important issue, the defendant undoubtedly had the right to show that [the] identification of him was unreliable." *Commonwealth* v. *Jewett*, 392 Mass. 558, 563 (1984), quoting *Commonwealth* v. *Franklin*, 366 Mass. 284, 290 (1974). "The ability to cross-examine the witness [who made a prior out-of-court identification but now denies or does not remember it] might be undermined to the point of a denial of confrontation rights . . . by such things as the judge's limiting the scope of cross-examination, or the witness's assertion of a privilege." *Commonwealth* v. *Cong Duc Le, supra* at

---

[20]We need not address whether Jamison's purported statements of identification made while in Williams's vehicle were properly admissible under the excited utterance exception to the hearsay rule, given the defendant's agreement that they could be admitted substantively. Had the defendant not so agreed, the record permits some doubt whether Jamison's statements met the requirements for that exception.

438, citing *United States* v. *Owens*, 484 U.S. 554, 561-562 (1988).

We turn to whether the error was harmless beyond a reasonable doubt. Identification of the shooter was the key issue at trial, and misidentification was the theory of the defense. See *Commonwealth* v. *Johnson, supra* at 465 ("danger of mistaken identification by a victim or a witness poses a real threat to the truth-finding process of criminal trials. . . . Compounding this problem is the tendency of juries to be unduly receptive to eyewitness evidence"). "It is crucial to the fact finder's assessment of the truth to allow the defendant to probe fully on cross-examination the infirmities of the identification." *Commonwealth* v. *Vardinski, supra* at 450-451.

Williams's identification of the shooter at trial was somewhat uncertain, and none of the other trial witnesses was able to identify the defendant as being the shooter. On cross-examination, Williams testified that she was influenced in her recognition of the defendant by Jamison's statement, "There goes Lawz," that she only glanced briefly over her shoulder at the side view of the hooded man's face, and that she might have been mistaken in her identification. See *Commonwealth* v. *Walker*, 460 Mass. 590, 604 n.16 (2011) (eyewitness testimony is "greatest source of wrongful convictions"). Guerrero, who was standing only one car-length away from the shooter for up to several minutes, was unable to identify the defendant from a photographic array and selected another individual. Canty could not identify anyone, and Garvin was able to identify the defendant not as the shooter but only as someone she had met through her brother well after the shooting.

In his closing, defense counsel attempted to point out that, because Jamison was not available to testify at trial, the defense was unable to cross-examine him as to his ability to observe the shooter, whether his observations were impaired by drugs (given that Jamison was "rolling weed"), and whether he had any bias toward the defendant. The prosecutor objected, and the judge sustained the objection, thereby exacerbating the prejudice to the defendant. See *Commonwealth* v. *Jewett, supra* at 563.

Throughout his questioning of witnesses and in particular in his closing, the prosecutor relied heavily on Jamison's reported

statement, made while in Williams's vehicle, identifying the defendant. He emphasized the name "Lawz" in questioning Williams and Garvin, reiterating it himself and soliciting repeated testimony on Jamison's use of the name. He elicited from Duggan, the lead homicide investigator, that there were no leads in the case until March 15, 2007, when Jamison "c[a]me forward," thus emphasizing the importance of Jamison's testimony in the eyes of the investigating officers.

The impact on the jury of Jamison's reported statement was likely significant. That the statement was important in the jury's deliberations is reflected in one of their questions to the judge.[21] The nonidentification evidence was particularly critical in this case, given that Jamison did not testify at the grand jury to having made the statement of identification attributed to him at trial, and indeed testified that it was Williams, and not he, who identified the shooter, whom he had never seen before. Moreover, when asked at the grand jury to identify a photograph of "Lamory," Jamison did not select a photograph of the defendant. This could well have had heightened significance, since the nearby witness to the shooting, Guerrero, also failed to select a photograph of the defendant when asked to identify the shooter.

We cannot say that the error precluding the defendant from using Jamison's grand jury testimony was harmless beyond a reasonable doubt. It deprived the defendant of the ability to impeach a critical witness and, thus, deprived him of a fair trial. See *Commonwealth* v. *Bohannon*, 376 Mass. 90, 94 (1978), *S.C.*, 385 Mass. 733 (1982), citing *Chambers* v. *Mississippi*, 410 U.S. 284 (1973) ("When evidence concerning a critical issue is excluded and when that evidence might have had a significant impact on the result of the trial, the right to present a full defense has been denied"). A new trial is required on this basis alone.

2. *Hearsay identification of photographs by Garvin.* By the time of her grand jury appearance, on October 10, 2007, Garvin was able to identify the defendant as "Lawz," based on the

---

[21]"Question No. 1. 'Is [Williams's] testimony that she heard stated "Lawz" and/or "Lamory" in the car direct evidence, something that she "claims to have heard with her own senses?" ' And it references page 11 of my instructions."

introduction made by her brother in September, 2006, months after the shooting.

The prosecutor introduced, over objection and following a voir dire hearing, three photographs with Garvin's writing on the back of each. Around the time of her grand jury appearance, police showed her a series of photographs, including the defendant's, and asked if she recognized anyone; she was not asked to identify the shooter. She wrote on the back of one of the photographs, "Went to school with. From Geneva. Nothing to do with it"; on another, "I saw him around Mattapan, and he had nothing to do with this"; and on the defendant's photograph, "My brother's friend Lawz." After her voir dire, at which Garvin testified that she did not write "nothing to do with it" on the back of the defendant's photograph because she remembered the name "Lawz" as being used in Williams's vehicle on the day of the shooting, the annotated photographs were ruled admissible as prior acts of identification. See Mass. G. Evid. § 801(d)(1)(c) (2012). Garvin's identification of the defendant's photograph was also ruled admissible. The judge, however, cautioned the prosecutor that he was not to imply by this evidence that Garvin had recognized the defendant as the shooter. Nonetheless, over repeated objection, the prosecutor did precisely that, in both his questioning and his closing argument, when he repeatedly emphasized that Garvin wrote "nothing to do with it" on the two photographs but did not write "nothing to do with it" on the defendant's photograph, implying that Garvin had recognized the defendant as the shooter.

The defendant maintains that the statements and the photographs were inadmissible under Mass. G. Evid. § 801(d)(1)(c). To be admissible, evidence must, first, be relevant "to prove an issue in the case." *Commonwealth* v. *LaCorte*, 373 Mass. 700, 702 (1977). Once having met this threshold inquiry, however, relevant evidence is inadmissible if "its probative value is substantially outweighed by its prejudicial effect." *Commonwealth* v. *Sylvia*, 456 Mass 182, 192 (2010). "Whether evidence . . . is relevant, and whether the probative value of such evidence is outweighed by its potential for unfair prejudice, are determinations committed to the sound discretion of the trial judge and will not be disturbed by a reviewing court absent

'palpable error.' " *Commonwealth* v. *Rosario,* 460 Mass. 181, 192-193 (2011), quoting *Commonwealth* v. *McCowen,* 458 Mass. 461, 478 (2010). The defendant bears the burden of establishing both an abuse of discretion and the resulting prejudice. *Commonwealth* v. *Rosario, supra,* citing *Commonwealth* v. *Repoza,* 382 Mass. 119, 125 (1980), *S.C.,* 400 Mass. 516, cert. denied, 484 U.S. 935 (1987). Here, the defendant has met that burden.

Regardless of whether the statements and the photographs were properly admissible as a hearsay exception, see Mass. G. Evid. § 801(d)(1)(c), a question we need not decide, they were not relevant to establish any fact at trial. The photographs and Garvin's statements of recognition as to someone she knew from her high school, and someone else she recognized as a resident of Mattapan, neither of whom had any involvement in or witnessed any of the events, served merely to confuse the jury and should not have been admitted. See Mass. G. Evid. § 401.

Garvin's testimony concerning her introduction to the defendant months after the shooting, and her resulting ability to identify the defendant at trial and in a photograph, was of marginal relevance at best. Likewise, her testimony that, when introduced to her brother's friend, "Lawz," she recalled that name as having been used in Williams's vehicle, was, if relevant to a recounting of events on the day of the shooting, certainly cumulative of her testimony as to what she heard while in the automobile. Such testimony was far more prejudicial than probative in any event, in a case where the identity of the shooter was the central issue. See Mass. G. Evid. § 403 (evidence not admissible if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues [or] misleading the jury"). Admission of the photographs in such circumstances was prejudicial error.

3. *Rap video.* The defendant challenges the introduction of the rap video as evidence of his gang membership. In the circumstances of an apparently random shooting on a public sidewalk, evidence of the feud between H-Block and Heath Street, and of the defendant's membership in Heath Street, was relevant to provide a reason for an otherwise inexplicable killing. "We repeatedly have held that evidence of gang affiliation is

admissible to show motive or joint venture . . . ." *Commonwealth* v. *Rosario, supra* at 193, quoting *Commonwealth* v. *Swafford*, 441 Mass. 329, 332 (2004). See *Commonwealth* v. *Smith*, 450 Mass. 395, 399, cert. denied, 555 U.S. 893 (2008) (evidence of defendant's gang membership and turf war over use of park for drug sales properly admitted to show motive for shooting where police officer testified to defendant's gang membership and ongoing territorial dispute based on personal knowledge, and even where evidence also included improper opinion evidence, it was harmless error because cumulative of gang membership evidence offered by multiple other witnesses); *Commonwealth* v. *Garcia*, 443 Mass 824, 834 (2005) (evidence victim "flashed" gang colors admissible to explain defendant's state of mind). Nevertheless, relevance is only the threshold inquiry, and the proffered evidence must also be more probative than prejudicial. The rap video was not.

As stated, after viewing the video that the prosecutor sought to introduce as evidence of the defendant's membership in Heath Street and his "pledging allegiance" to the Heath Street gang, the judge ruled that its admission would be "more prejudicial than probative" and ordered it excluded unless the defendant challenged evidence of his gang membership. The judge allowed the video to be played for the jury, over vehement objection and offers by the defendant to stipulate to gang membership, following cross-examination of Duggan about the defendant's photograph in the gang database.

A determination whether to permit the Commonwealth to rehabilitate its witness is within the discretion of the trial judge. See *Commonwealth* v. *Rosario, supra.* Even if we accept the judge's conclusion that rehabilitation of Duggan was necessary to rebut any possible inference that the defendant contested gang membership, however, the rap video should not have been admitted. It was minimally if at all probative, and highly prejudicial. "[E]vidence that poses a risk of unfair prejudice need not always be admitted simply because a defendant has opened the door to its admission; the judge still needs to weigh the probative value of the evidence and the risk of unfair prejudice, and determine whether the balance favors admission." *Commonwealth* v. *McCowen*, 458 Mass. 461, 479 n.15 (2010).

By the time the rap video was introduced, the defendant had not otherwise contested that he was a gang member; indeed, he had offered to stipulate to that effect. Sheehan had testified as an expert as to the defendant's gang membership, and the Boston police gang database, containing the defendant's photograph, had also been admitted in evidence. Given the result of the voir dire, the defendant had refrained from cross-examining Sheehan precisely to avoid having the jury view the rap video.

The video was produced at an unknown point in or before 2005, and was available on a commercial Web site promoting rap artists. The defendant did not write or perform the lyrics or produce the video,[22] and it was not found in his possession. The lyrics show no connection to the defendant that would suggest they were biographical or otherwise indicative of his own motive or intent at the time of the shooting. Contrast, e.g., *Jones* v. *State*, 347 Ark. 409, 417-421 (2002). Yet, the video was admitted specifically as an asserted statement of gang allegiance by the defendant, based on Sheehan's voir dire testimony as to its meaning.

Even if the video had contained direct statements of the defendant's gang allegiance, we are not persuaded by the opinions of courts in other jurisdictions that view rap music lyrics "not as art but as ordinary speech" and have allowed their admission in evidence as literal statements of fact or intent "without contextual information vital to a complete understanding of the evidence."[23] Dennis, Poetic (In)justice? Rap Music Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J.L. & Arts 1, 4,

---

[22]The rap video "Heat Life, Nothing But a P Thang" evidently draws from both the music and lyrics of the rap song "Nuthin' But a 'G' Thang," written by "gangsta rapper" Dr. Dre and performed by rapper Snoop Dogg, on the 1992 platinum-selling album "The Chronic." See Johnson, Silencing Gangsta Rap: Class and Race Agendas in the Campaign Against Hardcore Rap Lyrics, 3 Temp. Pol. & Civ. Rts. L. Rev. 25, 35 (1994); Tribett-Williams, Saying Nothing, Talking Loud: Lil' Kim and Foxy Brown, Caricatures of African-American Womanhood, 10 S. Cal. Rev. L. & Women's Stud. 167, 183 n.128, 186 & n.158 (2000); Williams, Silence and Postmodern Copyright, 29 Cardozo Arts & Ent. L.J. 46, 58 & n.70 (2011).

[23]One study of 1,922 songs on 130 rap albums that sold over one million copies each found that violence was a theme in sixty-five per cent of rap music lyrics, and violent retaliation in thirty-five per cent. Kubrin, Gangstas, Thugs, and Hustlas: Identity and the Code of the Street in Rap Music, 52 Soc. Probs. 360, 367-369 (2005) (Kubrin). See Folami, From Habermas to "Get

38 & n.224 (2007) (Dennis) (collecting cases); *id.* at 1, citing Lyddane, Understanding Gangs and Gang Mentality: Acquiring Evidence of the Gang Conspiracy, 54 U.S. Attorney's Bull., no. 3, 2006, at 8 (advising prosecutors to seek out rap lyrics as evidence for trial). In contrast to such treatment of rap music, "[c]ourts do not treat lyricists of other mainstream musical genres similarly, even those who live an outlaw lifestyle or promote an outlaw image . . . are not presumed to be making statements about their beliefs, intent or their conduct. . . . [W]ith respect to country music, we do not likely believe that Johnny Cash shot a man simply to watch him die. With respect to reggae, we do not generally take to heart Bob Marley's proclamation: 'I shot the sheriff, but I did not shoot the deputy . . . .' " (Footnotes omitted.) Dennis, *supra* at 15. We discern no reason why rap music lyrics, unlike any other musical form, should be singled out and viewed sui generis as literal statements of fact or intent.

Although Sheehan asserted during the voir dire that the video "consists of discussing being a Heath Street gang member and what takes place or what's done or conducted by individuals who are Heath Street gang members," there was no evidence that Sheehan was an expert on music video recordings or rap music. A police officer who has been qualified as a "gang expert" cannot, without more, be deemed an expert qualified to interpret the meaning of rap music lyrics.[24] In any event, Sheehan did not mention the rap video in his trial testimony. Duggan,

Rich or Die Tryin' ": Hip Hop, the Telecommunications Act of 1996, and the Black Public Sphere, 12 Mich. J. Race & L. 235, 274 (2007) (Folami); Wilson, Rap Sheets: The Constitutional and Societal Complications Arising from the Use of Rap Lyrics as Evidence at Criminal Trials, 12 UCLA Ent. L. Rev. 345, 347, 350, 352-354, 356-359 (2005), and articles cited.

[24]Over the past twenty years there has been extensive academic discourse on the role and function of rap music, and in particular the violence in "gangsta rap," as a form of political expression. See, e.g., Dennis, Poetic (In)justice? Rap Music Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J.L. & Arts 1 (2007) (Dennis); Firestre, Catchin' the Heat of the Beat: First Amendment Analysis of Music Claimed to Incite Violent Behavior, 20 Loy. L.A. Ent. L. Rev. 1, 2 n.5, 18 (2000); Folami, *supra* at 274-281; Johnson, Silencing Gangsta Rap: Class and Race Agendas in the Campaign Against Hardcore Rap Lyrics, 3 Temp. Pol. & Civ. Rts. L. Rev. 25, 28 (1994); Kubrin, "I See Death Around the Corner: Nihilism in Rap Music," 48 Soc. Persp. 433 (2006); Kubrin, *supra* at 360-378.

who testified regarding the video at trial, did not do so as an expert and stated explicitly that he knew nothing about rap music. The only statements he made concerning the content of the rap video were to describe the defendant's location in various still photographs derived from it. Therefore, there was no basis on which either witness properly could offer an expert opinion on the meaning of the video as a pledge of gang allegiance, the reason for which it was ostensibly admitted. The jury heard no other expert testimony as to the video's meaning. Compounding the error, in closing argument the prosecutor relied heavily on Sheehan's voir dire explanation of the meaning of the video as the defendant's "pledging his allegiance" to Heath Street, statements for which the jury heard no basis.

Balanced against the minimal probative value of the video, its prejudicial effect was overwhelming. Although the defendant is neither of the two featured rappers, lyrics such as "forty-four by my side," accompanied by images of stereotypical "gangsta thugs," some of whose faces are covered by bandanas, could not but have had a prejudicial impact on the jury.[25] The impact of the video was evident even on the trial judge, who stated that he relied on it in reaching a conclusion concerning the defendant's gang membership. Even if defense counsel's question about the defendant's photograph in the gang database is viewed as having challenged his status as a Heath Street gang member, other corrective measures, such as the defendant's offered stipulation, would have been sufficient to rebut any perceived challenge. We agree with the initial determination of the judge: the prejudicial effect of the rap video far outweighed its probative

---

[25]See Dennis, supra at 1, quoting Jackson, Prosecuting Gang Cases: What Local Prosecutors Need to Know, 42 Prosecutor 32, 36 (2008):

"Will the Real Defendant Please Stand Up?

"Perhaps the most crucial element of a successful prosecution is introducing the jury to the real defendant. Invariably, by the time the jury sees the defendant at trial, his hair has grown out to a normal length, his clothes are nicely tailored, and he will have taken on the aura of an altar boy. But the real defendant is a criminal wearing a do-rag and throwing a gang sign. Gang evidence can take a prosecutor a long way toward introducing that jury to that person. Through photographs, letters, notes, and even music lyrics, prosecutors can invade and exploit the defendant's true personality."

value. Admission of the rap video was, in the circumstances, prejudicial error.

4. *Other claims of error.* Given the result we reach, we do not address the defendant's remaining claims of error, confident that matters such as the Commonwealth's too frequent reliance on grand jury testimony, where trial testimony was not inconsistent and no finding of feigned memory loss was made, see *Commonwealth* v. *Raymond*, 424 Mass. 382, 388-389 & n.6 (1997), *S.C.*, 450 Mass. 729 (2008); and the admission of opinion testimony from a police witness assessing the demeanor of grand jury witnesses, see *WBZ-TV4* v. *District Attorney for the Suffolk Dist.*, 408 Mass. 595, 599-601 (1990), and *Commonwealth* v. *Colon*, 64 Mass. App. Ct. 303, 306-307 (2005), quoting *Commonwealth* v. *Triplett*, 398 Mass. 561, 567 (1986), will not be repeated at any new trial.

*Conclusion.* The defendant's convictions are reversed, the verdicts are set aside, and the case is remanded for a new trial in accordance with this opinion.

*So ordered.*