NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12898


COMMONWEALTH  vs.  WILLIAM OMARI SHAKESPEARE.



Suffolk.     April 10, 2023. - November 30, 2023.

Present:  Budd, C.J., Gaziano, Cypher, Kafker, & Wendlandt, JJ.


Homicide.  Firearms.  Evidence, Testimony before grand jury,
    Testimony at prior proceeding, Previous testimony of
    unavailable witness, Relevancy and materiality,
    Identification, Third-party culprit, Consciousness of
    guilt, Opinion.  Error, Harmless.  Practice, Criminal,
    Harmless error, Hearsay, Assistance of counsel.



Indictments found and returned in the Superior Court
Department on September 28, 2016.

The cases were tried before Christine M. Roach, J., and a
motion for a new trial, filed on September 9, 2021, was
considered by her.


Amy M. Belger (James N. Greenberg also present) for the
defendant.
Sarah Montgomery Lewis, Assistant District Attorney, for
the Commonwealth.


CYPHER, J.  On the afternoon of June 14, 2016, Marcus Hall

(victim) was shot and killed outside a barbershop (shop) where

he brought his four year old son for a haircut.  A grand jury

indicted the defendant, William Omari Shakespeare, for the victim's murder and related firearms offenses.  At trial, the defendant argued that another person present in the shop at the time of the murder, Mark Edwards, was the shooter.  The jury convicted the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty and of all firearms charges.[1]

Appealing from his convictions and the denial of his motion for a new trial, the defendant argues that the evidence that the defendant committed the killing was insufficient; that the judge committed prejudicial error in failing to allow Edwards's grand jury testimony in evidence where Edwards was deceased and the evidence supported the defendant's third-party culprit defense; that Boston police Sergeant Detective Michael Stratton impermissibly testified about his observations of the video evidence; and that trial counsel was ineffective for failing to object to Stratton's testimony and for pursuing a particular line of questioning with Stratton that the defendant alleges diminished counsel's credibility with the jury.  The defendant also asks us to reduce his verdict of murder in the first degree

---

[1] The defendant was convicted of unlawful carrying of a firearm without a firearm identification card, G. L. c. 269, § 10 (a); unlawful possession of ammunition without a firearm identification card, G. L. c. 269, § 10 (h) (1); and unlawful carrying of a loaded firearm without a license, G. L. c. 269, § 10 (n).

or order a new trial pursuant to our power granted by G. L. c. 278, § 33E.

We conclude that it was error to prohibit counsel from introducing Edwards's grand jury testimony and that such error was not harmless beyond a reasonable doubt. As a result, we must reverse all the defendant's convictions, as his convictions on the firearm charges were intertwined with his murder conviction. Holding that the evidence was sufficient for the defendant's conviction of murder in the first degree, however, we reverse and remand the case for a new trial. Pursuant to our decision in Commonwealth v. Guardado, 493 Mass. 1 (2023) (Guardado II), the defendant may also be retried on the firearms offenses. Because the remainder of the issues raised by the defendant may recur at a new trial, we address them and hold that Stratton's testimony was admissible and counsel was not ineffective.

1. Background. a. Facts. "Because the defendant challenges the sufficiency of the evidence as to murder in the first degree," we recite the facts in detail in the light most favorable to the prosecution, reserving certain details for later discussion. Commonwealth v. Whitaker, 460 Mass. 409, 410 (2011).

i.  <u>The murder</u>.  On Tuesday, June 14, 2016, at around 11:53
<u>A</u>.<u>M</u>., the victim brought his four year old son Ryan[2] to the shop
in the Mattapan section of Boston for a haircut.  On that date,
there were five barbers working at the shop:  Levi Preddie,
Mattia Zagon, Raymond Menzie, Isaac Lewis, and Jodie Davis.
Although Zagon was the victim's and Ryan's regular barber, Lewis
cut Ryan's hair that day.  Zagon knew the victim as "smart,
driven[,] . . . sociable," and as intent on "empowering us as
[B]lack people."  The victim was not "easily agitated or
angered."

The shop, a social "hotspot" for those in the community,
frequently had people from the neighborhood come in only to
socialize.  When any barber did not have a client in his chair,
the barbers passed the time by cleaning, entertaining other
clients in the shop, and playing games and music.  On that day,
the shop was not busy.

The shop was small and narrow.  Behind a half wall at the
back of the shop were sinks for hair washing, a supply closet on
the left (the first door on the left), and a bathroom just
before the back door (the second door on the left).  There were
two doors allowing access to the shop:  a front door facing Blue
Hill Avenue and a back door facing the parking lot behind the

---

[2] A pseudonym.

shop (rear lot).  The rear lot was covered in gravel.  A gate to the rear lot provided access and sometimes was open and sometimes locked.  On June 14, 2016, it was open.  Typically, individuals who worked at the shop and surrounding businesses would park in the rear lot, along with regular clients who occasionally would also park there.  The back door was open on that day to let in a breeze.

The shop was situated between Blue Hill Avenue, Morton Street, and Landor Road, nearer to the corner of Blue Hill Avenue and Morton Street.  To access the rear lot, a driver would have to turn right from Blue Hill Avenue onto Landor Road and then turn left from Landor Road into the parking lot.  Once a driver turned left into the lot, he or she first would pass a smokehouse and a red trash barrel, and then turn left again into the rear lot.  Intersecting Landor Road and Morton Street behind the shop was Leston Street.  On the day of the murder, there were cameras posted in the shop, but not outside the shop in the rear lot.

Earlier on that day, before the victim[3] and his young son arrived, the defendant arrived at the shop at approximately

---

[3] The victim was wearing a green shirt and jeans on the day he was killed.

11:37 A.M.[4]  The defendant was wearing a light red shirt with a bear pictured on the front, and lighter colored pants.  At the time of the murder, the defendant had been going there to get his hair cut for a few years, and never had he caused a problem.  The barbers knew the defendant as "brown man" and the "Jamaican guy."

When the defendant arrived that day, he entered by the back door and brought food with him; he ate and chatted with the barbers about basketball.  From the video recording (video) of the activity inside the shop, as the defendant was speaking with the barbers, he appeared to be friendly and animated.[5]  When Zagon arrived that day at around 11 A.M. or noon, he saw Preddie's blue car parked in the rear lot, as well as a black Toyota that was unknown to him.  Zagon parked his own car, also blue, in the rear lot.

As mentioned supra, at approximately 11:53 A.M., the victim and his son entered the shop.  Immediately after entering, the victim engaged in a discussion with the defendant.  Menzie noted

---

[4] Although Lewis testified that the victim arrived before the defendant, the video footage from the shop belies this testimony.

[5] The video of inside the shop was reviewed as a part of our G. L. c. 278, § 33E, review.  The times depicted in the shop video were forty-three minutes behind real time, and the Commonwealth entered a time conversion sheet as an exhibit at trial.

that it seemed as if the defendant and victim knew each other. As shown in the video, the defendant's body language changed as he was speaking with the victim; neither he nor the victim appeared to be laughing or joking. The victim told the defendant that he had been trying to get in touch with the defendant by telephone. After approximately one minute of conversation, the victim walked toward the back of the shop and out the back door. The defendant followed the victim within the minute, returned briefly to the back of the shop within ten seconds, and then left through the back door again. Lewis had to close the back door to the shop because they were arguing and "it was loud." Davis heard someone say "fuck" loudly, but did not know who was arguing in the rear lot. After approximately two minutes, at around 11:57 A.M., the victim reappeared on the video and walked from the front to the back of the shop and out the door again. The defendant did not reenter the shop for about twenty minutes.

When the victim reentered the shop at around 11:59 A.M. through the back door, he appeared to be preoccupied. He left the shop briefly but returned, and used his cell phone for a while, which struck Preddie as unusual. At around 12:13 P.M., the victim walked to the back of the shop and seemed to look out the back door, and then walked to the front.

At 12:17 P.M., another man, later identified as Mark Edwards, entered the shop through the back door. He was wearing a bright red shirt, dark jeans, a bulky gold chain, and sunglasses on top of his head, and he was carrying a small bag with straps around his chest. He appeared to greet the barbers sitting at the back of the shop, look at the front where the victim was located, turn around, and walk out the back door while on his cell phone.[6] Edwards was not a regular client, and the barbers who knew of him referred to him as "dreads" or "dreadlocks." Menzie testified that Edwards was a "social" and "cool" person and that he never saw Edwards get into a fight at the shop.

At approximately 12:19 P.M., the defendant reentered the shop by the back door. The victim put down his cell phone and walked to the back of the shop toward the defendant. Lewis heard the defendant say to the victim, "Let me talk to you." The defendant stepped out the back door first, with the victim close behind him.[7] When they went outside, Davis did not see anyone else out in the rear lot. Within five seconds, the

---

[6] When Preddie and Davis were entering the shop by the back door after playing cricket in the rear lot, they saw Edwards. Preddie testified that Edwards was walking outside from the shop's back door; Davis testified that Edwards was walking toward the back door of the shop.

[7] Ryan was with Lewis then near the back of the shop.

victim appeared to lunge forward and then moved back to the doorway.[8]

At this point, Preddie was at the sink, and as he was drying his hands, he heard a loud bang and saw the victim fall against the door. The victim looked at the barbers in the shop, and then went back out the back door and was shot almost immediately. Zagon said that the victim looked "scared" when he briefly moved back to the doorway of the shop. Preddie heard "a lot" of gunshots, and Menzie heard more than one. The barbers felt stones hitting their legs as they stood toward the back of the shop, and something hit Lewis's hat. When the barbers heard gunshots, Preddie grabbed Ryan and brought him toward the front of the shop. Zagon skated out in the in-line skates he was wearing when he heard the shots, but then returned, picked up Ryan, and brought him to the shop next door.

Despite the argument that occurred between the victim and defendant in the rear lot earlier that day, Menzie testified that each had a "normal" and "flat" demeanor. Davis stated that the defendant and victim were having a normal conversation in the shop. Not one barber saw who shot the victim or was able to

---

[8] At trial, when Lewis testified that he did not know why the victim went out the back door and briefly stepped back in before again going out, the prosecutor impeached him with his grand jury testimony that the defendant pulled the victim out to the rear lot and that he then heard gunshots.

see anyone in the rear lot at the time of the gunshots or directly after.

Immediately after the gunshots and after Preddie saw the victim on the ground in the rear lot, Preddie and Davis went to a nearby restaurant to call police.  After Zagon brought Ryan next door, he went to the rear lot and saw the victim on the ground.  He still was breathing; Davis and Lewis tilted the victim forward because they noticed that he was choking on his own blood.  They called 911, but the victim died before the ambulance arrived.  Lewis noticed gunshot wounds in the victim's head and his leg.[9]

After the shooting, the barbers never again saw the defendant at the shop.  The black Toyota no longer was parked in the rear lot, and Zagon never again saw it.

ii.  The investigation.  On June 14, 2016, Boston police Officer Patrick Conroy was working in the police station at the intersection of Blue Hill Avenue and Morton Street when he

---

[9] The medical examiner testified that the victim's cause of death was multiple gunshot wounds to the head, torso, and extremities.  He had an entrance gunshot wound on his left cheek, and an exit wound on his right cheek, which caused a hemorrhage within the soft tissue and fractured his facial bones.  He had an entrance gunshot wound to his left upper chest; the bullet associated with this wound traveled through the chest, lung, heart, liver, stomach, intestines, and left kidney before coming to rest in the soft tissue of his left buttock.  There were five gunshot wounds to the victim's legs and entrance and exit gunshot wounds on one of his fingers. There was no soot or stippling on the victim's body.

received a broadcast at 12:23 P.M. regarding a ShotSpotter[10] activation in the area of the shooting. ShotSpotter detected five separate shots in this incident. Several people directed police to the rear of the shop, where they observed the victim lying on his side in the rear lot. He was unresponsive and unarmed. Observers were congregated by a wall in the rear lot. Conroy observed one shell casing between the victim and the shop, and his partner, Officer Matthew Wyman, observed another shell casing. They did not see anyone fleeing or leaving the scene.

Officer Michael Connolly from the Boston police department crime scene response unit received a call to report to the shop at around 12:30 P.M. He walked through the scene with Stratton and Sergeant Detective Dan Duff. Police recovered five shell casings at the scene: one was silver in color, and four were brass in color. They took note of a tuft of hair and material on the ground, three beer cans,[11] a lead fragment from a projectile, and a cigarette butt, and processed the scene for

---

[10] "A 'ShotSpotter' system 'identifies firearm discharges by sound and directs officers to the general location of the shots.'" Commonwealth v. Cuffee, 492 Mass. 25, 27 n.2 (2023), quoting Commonwealth v. Evelyn, 485 Mass. 691, 694 (2020).

[11] A criminalist with the latent print unit in the Boston police department was able to match fingerprints on two of the beer cans to known individuals who either worked in or frequented the area.

latent fingerprints.  They returned the next day to look through some trash gathered by the barbers after police left.  They swabbed a bottle found in the trash for deoxyribonucleic acid (DNA).

In June 2016, Stratton had three detectives reporting to him:  Vance Mills, Jose Teixeira, and Nicholas Moore.  On June 14, he received a call at around 12:38 P.M. to investigate the victim's death.  Stratton directed Mills and Teixeira to remain at the station to conduct interviews while he and Moore went to the scene.  When they arrived, Blue Hill Avenue from Landor Road to Morton Street was barricaded by tape, along with the rear lot behind the shop.  Stratton recovered the victim's cell phone at the scene but was unable to attribute a telephone number to the defendant through the victim's cell phone.  The two cars Stratton observed in the rear lot on his arrival on scene were determined to belong to the barbers.  Police were unable to find any firearms or additional bullets.

Police were able to recover video surveillance to assist in their investigation from cameras at several locations:  a bus operated by the Massachusetts Bay Transportation Authority (MBTA) traveling on Morton Street toward Blue Hill Avenue; a nearby ice cream shop and a nearby liquor store, both on Blue Hill Avenue; a private residence on Leston Street; and United States Department of Homeland Security (DHS) cameras for the

Boston police department mounted in the intersection of Morton Street and Blue Hill Avenue. No exterior cameras depicted the shooting.

From video discovered, Stratton was able to determine that at around 11:26 A.M., the defendant appeared at an ice cream shop a couple of blocks away from the barbershop. He left the ice cream shop at around 11:34 A.M. After the defendant left the ice cream shop, a black Toyota Camry was captured on the video being driven north on Blue Hill Avenue. Traveling in that direction, as a driver approaches Landor Road, a liquor store is located on the right side of the street. Video from a camera affixed to that store and facing Blue Hill Avenue depicted the car on which Stratton was focused turning onto Landor Street and heading toward the rear driveway leading to the rear lot of the shop. Video from a private residence depicted a black car being driven into the smokehouse parking lot (which leads to rear of the shop) at 11:36 A.M.[12]

On the recording captured by the shop camera, Stratton saw the defendant leave the shop at 11:56 A.M. He also observed, on the recording captured by the camera at the private residence, the black car leaving the rear lot at noon and being driven from Leston Street left onto Morton Street. The MBTA bus video

---

[12] As stated supra, the defendant entered the shop for the first time at 11:37 A.M.

captured the car driving toward Blue Hill Avenue on Morton Street, with the operator wearing a "light red burgundy type colored shirt." The video depicts the car turning right to traverse Blue Hill Avenue.

After watching the video footage from the shop, Stratton was aware that the defendant had reentered the shop at approximately 12:19 P.M. He attempted to locate the car he believed the defendant had been driving on the recordings he was able to access in the surrounding area. On the DHS video, Stratton saw what he believed to be the same car being driven on Blue Hill Avenue, stopping at a traffic light, and turning left onto Morton Street. At around 12:16 P.M., he observed the car being pulled over to the right side of Morton Street and stopping there, then a U-turn being made, and the car being parked on the opposite side of the street. After the car had been parked, at around 12:17 P.M., Stratton noted a man walking across the road, going toward the area of Morton Street where one can jump over a crushed fence behind a home and walk into the back of the shop.[13] At approximately 12:20 P.M., an individual walked across Morton Street to the area where the car was parked, the car was driven from the spot, a U-turn was made

---

[13] The ShotSpotter notification was at about 12:19 P.M.

on Morton Street, and the car was driven away on Morton Street. The car then was driven through the parking lot of a pharmacy.[14]

After watching the shop video many times, Stratton had the Boston regional intelligence center (BRIC) create an identification "wanted" flyer with photographs from the shop video of both Edwards and the defendant.[15]  By the end of June 14, police knew the defendant's nickname, but not his true name. They did not know Edwards's name.

Regarding his review of the shop video, Stratton testified on redirect examination that, in his opinion, when the victim and the defendant went out the back of the shop at 12:19 P.M., the victim punched the defendant, causing the defendant to go to the left out of view.  When the defendant reappeared in view, moving toward the victim, in Stratton's opinion he appeared to be holding a black item in his left hand.[16]  The video depicting this incident is blurry.  Stratton further thought that there

---

[14] Stratton testified that an individual walking from the parking lot onto Landor Road at around 12:22 P.M., in the direction of Blue Hill Avenue, and reentering the shop, in his opinion, was Lewis, concluding so based on his clothing and the shop video depicting his leaving the shop from the back and reentering by the front.

[15] Stratton stated that these men were not yet wanted for arrest, but only for identification purposes.

[16] Although Stratton was not aware whether the defendant was left- or right-handed, he found multiple photographs of the defendant on social media holding items in his left hand.

were two sets of feet to the right side of the doorway where the victim had been standing. Stratton thought that one person wore clothing similar to Edwards. Based on the placement of the shell casings found, Stratton did not think that those two people were involved in the shooting. Stratton also opined that the victim was facing where the defendant was standing when he stepped out from the back door of the shop for the last time. Although Stratton stated his belief that Edwards was in the rear lot at the time of the shooting, and was one of the individuals captured on the right side in the video, he could not be sure.

On June 20, 2016, Officer Stephen Puopolo was working at the front desk at the police station when Edwards arrived at the station with a woman named Lynette Taylor. He presented himself because Taylor "told him he was wanted" after seeing the photograph of him on the BRIC flyer. Edwards voluntarily accompanied two officers to the homicide unit for an interview with Stratton and Mills. Edwards was "nervous and concerned" that he was wanted for identification in relation to the investigation. Edwards voluntarily gave his cell phone to police, and told them that he sold marijuana, so he had erased or deleted a lot of the data on the cell phone. Edwards told police that, on June 14, he received a call from a person named "Taj," which was why he left the shop. Edwards was unable to produce a cell phone number for Taj, and police were unable to

identify him. At the interview, Edwards was unable to provide police with his own cell phone number. Police were unable to discover any connection between the cell phones of Edwards and the defendant or Edwards and the victim. He was released after speaking with the officers.

Amanda Holmes, who lived on Morton Street near the shop, testified at trial. At the time of the shooting, Edwards lived on the third floor of her building. On the left side of Holmes's building, there was an alley that abutted the rear of the shop. The fence line behind the building bordered the wooded area behind the smokehouse, and the fence, which had been damaged, easily was traversed.

Holmes knew that Edwards tended to wear "flashy" clothing and that he used the byname "Cancer." When she returned home from work on June 14, 2016, at around 4:30 P.M. or 5 P.M., her father and Edwards were sitting on the porch. Her father told her about the shooting, and Edwards, who was smoking, did not appear to be nervous and did not say anything. Edwards was dressed plainly and was without sunglasses. Edwards was shot and killed on May 13, 2017. At the time of trial, there were no suspects for that murder.

Also on the day of the shooting, Leigha Fontaine, who lived on Leston Street near the shop, was on her porch when she heard gunshots from the area of the smokehouse. With her dog, she

walked to the area.  She saw a person with a red shirt walking with a typical gait on Landor Street from the area of the shop's rear lot and then turning onto Blue Hill Avenue.  This individual was wearing a short-sleeved polo shirt, had dark skin, and appeared to be about six feet tall, with a slender build.[17]  She saw him about one minute after first hearing the gunshots.

The day after the victim's murder, Sandy Johnson, a woman who approached and spoke with detectives regarding the investigation, pointed out a particular residence on Morton Street (not Edwards's residence) as pertinent to the murder.  As a result of her communications to detectives, they looked for a bloody shirt in a trash barrel by the residence and reviewed video of the residence from June 14.  Johnson told police about someone with the byname "Cancer" entering an apartment with a bloody shirt.  Nothing was found.

Rebecca Boissaye, a criminalist in the DNA unit at the Boston police crime laboratory (lab) determined that the defendant was a possible source of the DNA on a bottle recovered from the trash at the shop, to which the defendant stipulated. The criminologist did not test the cigarette butt found at the scene because it appeared that it had been outside for a while,

---

[17] Leigha Fontaine testified that the shirt was not maroon and not a T-shirt.

and it did not look similar to the cigarette that the defendant was observed putting between his lips in the shop's video. Similarly, the hair and a small white fiber found at the scene were not tested.[18] Six holes were found in the victim's pants, and two holes were found in his shirt, which had reddish-brown stains consistent with blood. Because the firearm involved in the shooting never was recovered, the lab did not do gunshot residue distance determination testing. There was no soot on or stippling to the victim's clothing.

Christopher Finn, a criminalist from the Boston police department's firearms analysis unit, received the five shell casings found at the scene, as well as a ballistic fragment and a bullet recovered by a medical examiner. All were consistent with .40 caliber Smith and Wesson ammunition. The defendant stipulated that they all were from the same gun. As far as Finn could recall, all Smith and Wesson .40 caliber firearms have a port hole to the right and eject casings to the right. The medical examiner testified that it was possible that due to clothing, a person shot from six inches away may not have soot or stippling surrounding a wound, and he was unable to conclude whether the victim was shot from close range.

---

[18] The fabric was too small for Boissaye to consider testing for DNA. The hair was not tested because it had no roots or follicles.

From the end of September 2016 until January 31, 2017, officers made attempts to locate the defendant. At the time of the shooting, the defendant resided in Dedham. On January 31, 2017, after a four-month search, the defendant was located in New York City.

b. Procedural history. On September 28, 2016, a grand jury indicted the defendant on charges of murder in the first degree, G. L. c. 265, § 1; unlawful possession of a firearm, G. L. c. 269, § 10 (a); unlawful possession of ammunition, G. L. c. 269, § 10 (h); and unlawful carrying of a loaded firearm, G. L. c. 269, § 10 (n).

At the grand jury, Edwards, still alive at the time, testified. He told the grand jury that he was in the shop that day but between 9 A.M. and 9:30 A.M., which demonstrably was false as proved by the shop video. Edwards stated that he "jumped" his fence and went to the shop from the back and "dapped . . . up" the barbers sitting in the back when he entered. He testified that he left the shop from the back because he received a telephone call from his friend Taj; he remained there for about five minutes. When he left he did not see anyone outside, nor did he hear any gunshots. He knew the defendant as "brown man," but did not see him in the shop on that day.

Among other motions in limine, on July 10, 2018, the Commonwealth filed a motion in limine to exclude the defendant from admitting "[m]ulti-[l]evel [h]earsay" to bolster his third-party culprit or Bowden defense specifically with respect to Johnson's statements. See Commonwealth v. Bowden, 379 Mass. 472 (1980).

The defendant filed a motion in limine seeking to admit evidence of third-party suspects with a motive to kill the victim, specifically, Edwards. In this motion, the defendant requested that various pieces of evidence be admitted, including evidence that Edwards was present in the shop and departed from the back immediately before the shooting, the Johnson statements, hearsay statements from several other purported witnesses, and the BRIC flyer. In his written motion, he did not specifically request that Edwards's grand jury testimony be admitted in evidence at trial.

The trial began on July 30, 2018. During the trial, on August 7, the judge allowed the Commonwealth's motion with respect to the independent admissibility of the statements themselves, but denied it insofar as the defendant was permitted to question investigators about their work with respect to a potential third-party culprit. Also on August 7, the judge allowed the defendant's motion to the extent that Edwards's "identity as a person of interest in the barbershop on the

morning of the shooting [was] undisputed and the defense [could] cross-examine the lead investigators about their investigation of [him]."  The judge denied the motion with respect to the admissibility of "hearsay statements by unavailable witnesses," including Edwards's grand jury testimony, which the defendant requested to admit at trial.  The defendant argued that Edwards's grand jury testimony should be admitted as an exception to the rule against admitting hearsay, particularly as prior recorded testimony of an unavailable witness.  See Mass. G. Evid. § 804(b)(1) (2023).  Counsel argued that it was not hearsay because the defendant was offering it, "and it's prior recorded testimony."  He also argued that it should be admitted because Edwards "clearly lied about being at the barbershop," and because Edwards denied hearing gunshots, which he argued was relevant to Edwards's "consciousness of guilt."  The judge ruled that Edwards's grand jury testimony,

> "while potentially not hearsay pursuant to [Mass. G. Evid. § 804(a)(4)], [was] nonetheless controlled by Comm[onwealth] v. Clemente, 452 Mass. 295, 313-315 (2008), and . . . the defendant [could not] meet his burden to demonstrate that the Comm[onwealth] had the opportunity and similar motive with respect to . . . Edwards'[s] testimony at grand jury as if he were alive today to take the stand at trial."

At the close of the Commonwealth's evidence, the defendant's motion for a directed verdict was denied. Both parties' closing arguments addressed extensively Edwards's

presence at the shop on the day of the murder. The defendant focused on the fact that ninety seconds before the victim was killed, Edwards walked into the shop, looked at the victim, turned around while using his cell phone, and walked out. Counsel argued that Edwards "jump[ed]" the fence at the back of his house to get to and from the rear lot where the victim was shot. He focused on the report of the bloody shirt worn by "Cancer" on Morton Street and the fact that Edwards erased his cell phone before giving it to police. He further told the jury that Edwards "sa[id] he wasn't there for the shooting," even though that was not introduced in evidence. He called attention to the fact that Edwards since had been shot, a year after the murder, and told the jury that "[k]illers get killed."

In response, the Commonwealth acknowledged that Edwards was there at the time of the victim's murder, but focused on the evidence pointing to the defendant rather than Edwards. The prosecutor emphasized that the victim faced the defendant, not Edwards, when he was shot. She focused on Edwards's clothing and argued that if he intended to kill someone, he would not have dressed in such a "flashy" manner, with a "man purse or bag . . . holding [his] firearm." The Commonwealth argued that it was the defendant, not Edwards, who had been in an altercation with the victim, that the placement of the shell casings and the victim's injuries suggested that it could not have been Edwards

who shot the victim from where he was standing, and that it was unlikely that Edwards, who could enter the rear lot from behind his residence, would have walked along Morton Street with a bloody shirt.

On August 10, 2018, the jury convicted the defendant on all counts and found him guilty of murder in the first degree on theories of both deliberate premeditation and extreme atrocity or cruelty, after which the defendant timely filed a notice of appeal. The defendant filed a motion for a new trial in this court on September 9, 2021; it was remanded the next day for disposition in the Superior Court. The trial judge denied the motion without an evidentiary hearing. Before this court is the consolidated appeal from the denial of the defendant's motion for a new trial and his direct appeal from his convictions.

2. Discussion. a. Sufficiency of the evidence for murder in the first degree. The defendant argues that the evidence presented at trial required the jury to engage in "impermissible conjecture or surmise" as to whether the defendant or Edwards shot the victim. He also argues that the evidence was insufficient to support his conviction of murder in the first degree on a theory of either deliberate premeditation or extreme atrocity or cruelty. The Commonwealth argues that the evidence "pointed more strongly in the direction" of the defendant being

the shooter and supported the defendant's conviction on both theories. We conclude that the evidence was sufficient.

i. Standard of review. "In reviewing the sufficiency of the evidence, '[w]e consider whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'" Commonwealth v. Watson, 487 Mass. 156, 162 (2021), quoting Commonwealth v. Ayala, 481 Mass. 46, 51 (2018). Evidence relied on to support a verdict of guilty "may be entirely circumstantial." Commonwealth v. Whitaker, 460 Mass. 409, 416 (2011). "[T]he inferences a jury may draw from the evidence 'need only be reasonable and possible and need not be necessary or inescapable.'" Id., quoting Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011). Where the defendant was found guilty of murder in the first degree on theories of both deliberate premeditation and extreme atrocity or cruelty, "sufficient evidence for one would suffice to affirm the verdict." Whitaker, supra at 416-417.

ii. Equal opportunity. The Commonwealth need not "prove that no person other than the defendant could have committed the crime." Commonwealth v. Morgan, 449 Mass. 343, 349 (2007). If, however, after all evidence is submitted to the jury, "the question of the guilt of the defendant is left to conjecture or

surmise and has no solid foundation in established facts, a verdict of guilty cannot stand."  Commonwealth v. Salemme, 395 Mass. 594, 599-600 (1985), quoting Commonwealth v. Fancy, 349 Mass. 196, 200 (1965).  "The issue here, 'then, is whether the evidence pointing to [the] defendant as the actual perpetrator [is] in equipoise with the evidence pointing to [Edwards], or whether there [is] instead evidence pointing more strongly in the direction of the defendant such that the jury could rationally infer that he was the principal" beyond a reasonable doubt.  Morgan, supra at 350, quoting Commonwealth v. Torres, 442 Mass. 554, 564 (2004).

One of the leading cases regarding the identity of a shooter when there may be another possible shooter is Salemme, 395 Mass. at 595.  In Salemme, a man, Brian Halloran, entered a restaurant in the early hours of the morning and seated himself.  Id.  Twenty minutes later, a second man entered the restaurant and sat across from Halloran at the same table.  Id.  Both men were served a can of soda.  Id. at 595-596.  Later, a third man, the victim, entered the restaurant and sat between Halloran and the second man, with Halloran to his left and the second man to his right.[19]  Id. at 596.  While the employees were in the kitchen, they heard a gunshot.  Id.  When police arrived, they

---

[19] Salemme does not further explain the placement of the three men.

observed that the victim was shot above his right eye. Id. At trial, the defendant stipulated that a thumb print on a soda can located to the right of the victim was his fingerprint. Id. at 597. The medical examiner agreed that the victim's gunshot wound was "'consistent with a bullet being fired from the right side' of the victim." He admitted, however, that it was possible that the bullet was fired from the left if the victim had turned his head such that the right side of his head faced left. Id. The Commonwealth also introduced "considerable evidence of the defendant's apparent flight." Id. at 598. The Commonwealth did not try the case on a joint venture theory. Id.

The court held that the evidence was sufficient to prove beyond a reasonable doubt that the defendant was the "second man" in the restaurant, but not that the defendant, rather than Halloran, shot the victim. Salemme, 395 Mass. at 599. The three men were last seen together ten minutes before the shooting occurred. Id. In that period of time, the court ruled, whether the three men "changed positions, moved about, argued, remained as they were, or left the restaurant" was a matter of conjecture. Id. at 600. Even if the jury were permitted to infer that the defendant was seated on the right side of the victim, the evidence did not permit a jury to conclude beyond a reasonable doubt in what direction the

victim's head was turned and, consequently, whether the shooter was to the right or the left. Id. "[I]n [that] case there were two persons, [the defendant] and Halloran, with apparently equal opportunity to commit the murder. Given the Commonwealth's abandonment of a joint venture theory, it had to prove beyond a reasonable doubt that [the defendant] fired the fatal shot." Id. at 601.

In contrast to Salemme, in Morgan, 449 Mass. at 350, the court held that although the victim was last seen with two individuals, the evidence pointed "more strongly in the direction of the defendant's culpability as the perpetrator" to support the defendant's conviction. There, the victim was last seen getting into a car with the defendant and an alleged third-party culprit, Floyd Johnson, who was driving. Id. at 344. The presence of human blood was later detected on the rear exterior door handle on the driver's side of the car. Id. at 346. Initially, Johnson was also indicted for murder and conspiracy to commit murder. Id. at 344 n.2. Eventually, the Commonwealth entered a nolle prosequi on Johnson's murder indictment. Id. The defendant told police that he and Johnson went to see the victim to "pick up money the victim owed." Id. at 345. A witness testified that before the victim's murder, the defendant and Johnson met with him and showed him a nine millimeter weapon in Johnson's possession, along with a weapon in the defendant's

possession.  Id. at 347.  When the victim's body was discovered, the projectile recovered "could have been fired from a .357 Magnum or specific types of nine millimeter weapons."  Id. at 345.  The "Commonwealth did not proceed on a theory of joint venture."  Id. at 348.

The court held that the evidence was sufficient to uphold the defendant's conviction as the shooter, pointing to several incriminating statements the defendant made, including, among others, statements about the defendant's apartment being broken into, that the victim could not be trusted and would rob someone, and that the defendant "'was feeling real fucked up' because the victim 'died for the wrong reason' and that the victim was not the one who broke into the apartment."  Morgan, 449 Mass. at 351.  The defendant was also seen in possession of a gun that could have been used to kill the victim, and he threatened to kill the victim.  Id.  The court called attention to the fact that "[t]here was no evidence that Johnson shared this hostility toward the victim."  Id.

Here, similar to Morgan, a jury reasonably could infer based on the evidence that the defendant committed the shooting rather than Edwards.  The evidence inculpating Edwards, which admittedly supported a third-party culprit defense, paled in comparison to the evidence against the defendant.  The Commonwealth acknowledged that Edwards was in the rear lot

during the victim's murder and that there was evidence presented that may have implicated Edwards, including his brief entrance to the shop ninety seconds before the murder. Such evidence included the following: Edwards appeared to look toward the victim and leave while talking on a cell phone with a small bag around his chest; Edwards's deletion of data on his cell phone before he gave it to police; and the report of a bloody shirt for which police searched that allegedly belonged to someone with the same byname as Edwards. The "bloody shirt" was not found by police, no connection was made between Edwards and the victim, and no interaction was observed between the two.

The evidence inculpating the defendant, in comparison, was concrete. Put another way, the defendant's guilt "has [a] solid foundation in established facts." Salemme, 395 Mass. at 599, quoting Fancy, 349 Mass. at 200. Right around the time that the defendant arrived at the shop, video from surrounding cameras depicted a black Toyota leaving an ice cream shop, being driven toward the shop, and entering the parking lot behind the smokehouse, which led to the shop's rear lot. When the defendant first arrived at the shop, he appeared animated and in good spirits, and was eating as he chatted.

Immediately on the victim's entrance to the shop, he spoke with the defendant in what appeared to be a serious discussion, and it appeared that they knew each other. They went out the

back door of the shop, and one of the barbers had to close the door because the defendant and victim were arguing and "it was loud." A few minutes later, the black Toyota was captured on surrounding cameras leaving the rear lot, and an MBTA camera on a passing bus depicted the operator to be wearing a shirt similar in color to that of the defendant. After the defendant left, the victim was in and out of the shop and constantly on his cell phone, which one barber found to be unusual.

Just over fifteen minutes later, on the DHS video Stratton noticed what he believed to be the same black Toyota being driven on one side of Morton Street, staying there, and then making a U-turn and parking on the other side of the street. Stratton noticed then that someone walked across the street toward the area allowing entrance into the rear lot of the shop. Two minutes later, the defendant reentered the shop from the back door as depicted in the shop video. From this evidence, a jury reasonably could infer that the defendant chose to park his car in a spot farther away from the shop, despite his knowledge of and familiarity with the rear lot, to avoid detection after the shooting.

The moment that the defendant reentered the shop, the victim put down his cell phone and walked toward the back of the shop where the defendant was standing. The defendant said to the victim, "Let me talk to you." Within seconds of the

defendant and the victim walking out the door, the victim lunged forward in the direction of the defendant and retreated to the door with a scared look on his face.  The victim reentered the lot, running in the direction of the defendant, and almost immediately shots were fired.  Stratton pointed out that, about one minute after the defendant left the shop for the last time and the gunshots went off, an individual, as observed on the DHS video, walked across Morton Street, got into the black car, made a U-turn, and drove outbound.

The shop video's capture of the area just beyond the back door of the shop is blurry.  Nonetheless, the defendant can be observed as he walked out in front of the victim and moved to the left when the victim lunged toward him.  Immediately after the victim retreated and the defendant fell out of view of the camera to the left, the video depicted an individual approaching from the same direction, and wearing the same color as the defendant, jumping in the direction of the victim, and the victim went out of view of the camera toward that individual and was shot.  At that same time, two sets of legs, with one person wearing a shirt similar in color to that of Edwards, are visible to the right in the rear lot.

A rational juror could conclude that the location of the victim's wounds and the shell casing between his body and the shop indicate that the shooter fired from the defendant's

vantage point.  Based on the direction in which he entered the rear lot, as viewed in the shop video, the defendant stood to the left of the victim.  The victim was facing the defendant's direction when he went to the rear lot for the last time.  The victim had entrance gunshot wounds to the left cheek, left upper chest, and front part of his thighs.  At least one shell casing was found between the victim and the shop, and Finn testified that a Smith and Wesson .40 caliber firearm would "kick out" the shell casings to the right when shot.  This evidence supports a reasonable inference that the shooter was standing where the defendant would have been, as the shell casings would be expected to land somewhere in the area between the victim's body and the shop if someone to his left fired the shots.  The individual alleged to be Edwards, to the contrary, was to the victim's right and farther away.

Although consciousness of guilt alone could not support the defendant's conviction, "[e]vidence of flight indicates consciousness of guilt and is probative of the defendant's guilty state of mind."  Salemme, 395 Mass. at 601, quoting Commonwealth v. Booker, 386 Mass. 466, 469 (1982).  The fact that the defendant was found in New York City four months after police began looking for him, when he had a residence in Dedham, also supports the inference that the defendant was the shooter.

Taking together all the above evidence, a jury reasonably could infer beyond a reasonable doubt that it was the defendant who killed the victim, as supported by his interactions and argument with the victim indicating a prior relationship of some type, his proximate location in the rear lot as related to the placement of a shell casing and the victim's wounds, his movements during the relevant time, and the consciousness of guilt evidence.  Compare Morgan, 449 Mass. at 350-351 (evidence pointed more strongly toward defendant's culpability where defendant made inculpatory statements, there was no evidence that third party shared hostility toward victim, and defendant was seen in possession of potential murder weapons), with Commonwealth v. Mazza, 399 Mass. 395, 399 (1987) (insufficient evidence for murder conviction where there was no evidence that victim was killed while defendant was present at murder scene), and Salemme, 395 Mass. at 599-601.

iii.  Premeditation.  "In order to prove deliberate premeditation, the Commonwealth must show that 'the plan to kill was formed after deliberation and reflection.'"  Commonwealth v. Fernandez, 480 Mass. 334, 344 (2018), quoting Commonwealth v. Bolling, 462 Mass. 440, 446 (2012).  Even so, "no particular period of reflection is required, and . . . a plan to murder may be formed in seconds."  Commonwealth v. Gambora, 457 Mass. 715,

733 (2010), quoting Commonwealth v. Coleman, 434 Mass. 165, 168 (2001).

Here, the evidence was sufficient to show that the defendant had time to reflect on his decision to kill the victim, particularly because he left the shop and returned about twenty minutes later. See Fernandez, 480 Mass. at 345 ("In addition to a period sufficient for the defendant to have 'cooled off' and formed the intent to kill, the events here also show that the defendant left the scene of the altercation and returned with the weapon with the intent to kill the victim"). The reasonable inference that he parked in a different location when he returned to the shop, possibly to avoid detection, and left by the back door with the victim seconds after he arrived further demonstrates that his "decision to kill was the product of 'cool reflection.'" Gambora, 457 Mass. at 732, quoting Coleman, 434 Mass. at 167.

In addition, although the victim appeared to lunge toward the defendant at the start of the altercation, leading Stratton to conclude that the victim punched the defendant, the victim was shot not only in his legs and his finger, but also in his head and chest. In these circumstances, "the multiple shots fired at the victim were evidence of deliberate premeditation" and "[t]he placement of [a] fatal wound . . . in[] the victim's chest would also support a finding of deliberate premeditation."

Coleman, 434 Mass. at 168-169.  See Commonwealth v. Johnson, 435 Mass. 113, 119 (2001), S.C., 486 Mass. 51 (2020), quoting Commonwealth v. Stewart, 398 Mass. 535, 541 (1986) (retrieving and utilizing weapon, particularly gun, "is 'sufficient generally to permit an inference of premeditation'").  There was no evidence that the victim was armed, or that the defendant may have shot him in self-defense.  See Coleman, supra at 169.

iv.  Extreme atrocity or cruelty.  Although "sufficient evidence for [deliberate premeditation] would suffice to affirm the verdict," the evidence was also sufficient to support the jury's finding of extreme atrocity or cruelty.  Whitaker, 460 Mass. at 416-417.  At the time of the defendant's trial, "the jury had to find evidence of at least one of the factors enunciated in [Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983)]."  Commonwealth v. Castillo, 485 Mass. 852, 858 (2020). These factors included "indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed."  Cunneen, supra.  Since then, in Castillo, supra at 865, we revised these factors to ensure that a jury do not "find extreme atrocity or cruelty based only on the degree of a victim's suffering, without considering whether the defendant's

conduct was extreme in either its brutality or its cruelty."[20]
We noted in Castillo that our decision was to be applied "only
in murder trials that commence after the date of issuance of
[the] opinion," and did not apply it retroactively even in that
case.  Id. at 866.  With that in mind, we analyze this case
using the Cunneen factors, but also point out that the evidence
was sufficient even under Castillo.

The evidence was sufficient to support a finding that the
means the defendant used to kill the victim "were excessive and
out of proportion to what would be needed to kill a person."
Castillo, 485 Mass. at 866.  See Cunneen, 389 Mass. at 227.  The
defendant shot the victim six times:  once in the head, once in
the chest, twice in the thighs and once in the knee, and once in
the finger.  From this evidence, the jury could have found "that
the victim saw that he was about to be shot" and "attempted to
defend himself" as he was killed with his four year old son in
the building directly behind him.  Commonwealth v. Robinson, 482

---

[20] The new factors are as follows:  "whether the defendant
was indifferent to or took pleasure in the suffering of the
deceased"; "whether the defendant's method or means of killing
the deceased was reasonably likely to substantially increase or
prolong the conscious suffering of the deceased"; and "whether
the means used by the defendant were excessive and out of
proportion to what would be needed to kill a person."  Castillo,
485 Mass. at 865-866.  In considering the final factor, a jury
may consider "the extent of injuries to the deceased; the number
of blows delivered; the manner, degree, and severity of the
force used; and the nature of the weapon, instrument, or method
used."  Id. at 866.

Mass. 741, 746-747 (2019) (evidence that victim was struck by five bullets found in chair that tipped backward onto floor with gunshot wounds to head, chest, arm, hand, and leg at close range was sufficient to support finding of extreme atrocity or cruelty). See Commonwealth v. Alicea, 464 Mass. 837, 853 (2013) (evidence was sufficient to support extreme atrocity or cruelty where defendant fired five shots at victim as victim tried to flee, including fatal wound to victim's head, and defendant smiled and then frowned after victim fell).

Additionally, the evidence supported a finding of extreme atrocity or cruelty under Cunneen where there was evidence of the consciousness and degree of suffering of the victim. When some of the barbers went to the rear parking lot after the gunfire, they saw that the victim was still breathing and tilted his body because they noticed that he was choking on his own blood. See Castillo, 485 Mass. at 858-859 (evidence that victim was struggling to breathe after being shot, was gasping for breath, and was grasping for anything within reach was sufficient to support finding of extreme atrocity or cruelty under existing case law).

b. Exclusion of Edwards's grand jury testimony. The defendant asserts that the judge erroneously excluded Edwards's grand jury testimony. He argues that without knowing that Edwards lied in front of the grand jury, the jury had an

inaccurate and incomplete picture of Edwards as a potential third-party culprit, which resulted in reversible error. The defendant posits that Edwards's testimony was admissible under the constitutionally based hearsay exception.

The Commonwealth responds that the defendant did not meet the requirements to establish admissibility under the prior recorded testimony hearsay exception for an unavailable witness and that, even assuming the exclusion of Edwards's grand jury testimony was error, the error did not prejudice the defendant. The Commonwealth also argues that the testimony was not admissible under the constitutionally based hearsay exception because it was not "critical" to the defendant's case.

In Commonwealth v. Clemente, 452 Mass. 295, 313 (2008), cert. denied, 555 U.S. 1181 (2009), the court discussed the issue whether grand jury testimony of a now unavailable witness may be admissible against the Commonwealth under the prior recorded testimony exception to the hearsay rule. We "decline[d] to adopt a general rule that would allow the admission of prior recorded testimony from a grand jury proceeding of a now unavailable witness." Id. The prior recorded testimony exception to the hearsay rule only applies where it is testimony roughly equivalent to what a jury would have heard at trial were the witness available and where the party against whom the testimony is offered would "have had a

reasonable opportunity and similar motive to develop the testimony adequately, either by direct, cross-, or redirect examination." Id. "[T]he testimony provided to a grand jury is limited [to obtaining an indictment or preservation of testimony from an adverse witness], and [often] no attempt is made [by the Commonwealth] to corroborate or discredit the witness providing the testimony." Id. at 314-315. Occasionally, the Commonwealth may not yet possess sufficient evidence to confront and contradict an adverse witness. Id. at 315.

"If, however, the party seeking the admission of the grand jury testimony can establish that the Commonwealth had an opportunity and similar motive to develop fully a (now unavailable) witness's testimony at the grand jury, that earlier testimony would be admissible." Clemente, 452 Mass. at 315. It is likely that this burden will be very difficult for defendants to meet. Id.

Even if the defendant is unable to meet this burden, grand jury testimony amounting to hearsay may be admissible through the constitutionally based hearsay exception. Such evidence may be admissible, "despite its failure to fall into any of our traditional hearsay exceptions, provided that the defendant establishes both that it '[i]s critical to [the defendant's] defense' and that it bears 'persuasive assurances of trustworthiness.'" Commonwealth v. Drayton, 473 Mass. 23, 36

(2015), S.C., 479 Mass. 479 (2018), quoting Chambers v. Mississippi, 410 U.S. 284, 302 (1973).  See Chambers, supra (where excluded testimony "bore persuasive assurances of trustworthiness" and "was critical to [the defendant's] defense," "the hearsay rule may not be applied mechanistically to defeat the ends of justice").  Although this rule is not limited to third-party culprit evidence, see Drayton, supra at 35, we have specifically permitted otherwise inadmissible hearsay in that context, Commonwealth v. Silva-Santiago, 453 Mass. 782, 801 (2009) ("because the evidence is offered for the truth of the matter asserted -- that a third party is the true culprit -- we have permitted hearsay evidence that does not fall within a hearsay exception only if, in the judge's discretion, 'the evidence is otherwise relevant, [it] will not tend to prejudice or confuse the jury, and there are other "substantial connecting links" to the crime'"; and "the evidence, even if it is not hearsay, 'must have a rational tendency to prove the issue the defense raises, and the evidence cannot be too remote or speculative'" [citations omitted]).

Both Clemente and Drayton discuss exceptions to the rule against hearsay.  The problem, however, with analyzing Edwards's grand jury testimony under this framework -- under which the defense, the Commonwealth, and the judge all proceeded -- is that the testimony the defendant sought to introduce was not

hearsay.[21]  "[H]earsay is an extrajudicial statement offered to prove the truth of the matter asserted."  Commonwealth v. Stewart, 454 Mass. 527, 535 (2009), quoting Commonwealth v. Keizer, 377 Mass. 264, 269 n.4 (1979).  The defendant sought to admit Edwards's grand jury testimony "not . . . to prove any fact contained" within it, Stewart, supra, but to prove that Edwards was lying about being at the shop at the time the murder occurred.  He wanted to offer Edwards's statements not for their truth, but for their falsity.  In counsel's words, Edwards's testimony was "complete lies" and should have been admitted to complete the picture of the defendant's theory of the case: that Edwards committed the murder.  The judge acknowledged that "there's a nexus of time and place and identification of a human being.  I mean, there's a lot more in this case about a potential second suspect than there is in many cases."

The proper analysis, with this understanding in mind, is to decide whether the evidence should have been admitted for nonhearsay purposes.  "Arguing that a third party was the true culprit is, of course, 'a time-honored method of defending against a criminal charge.'"  Commonwealth v. Steadman, 489

---

[21] In her ruling on the admissibility of the grand jury testimony, although the judge mentioned that the testimony was potentially "not hearsay," she referred to Mass. G. Evid. § 804(a)(4), the rule for hearsay exceptions when the declarant is unavailable.

Mass. 372, 382-383 (2022), quoting Commonwealth v. Rosa, 422 Mass. 18, 22 (1996). "[T]he exclusion of third-party culprit evidence is of constitutional dimension, and therefore examined independently," rather than for an abuse of discretion. Silva-Santiago, 453 Mass. at 804 n.26. See Commonwealth v. Cassidy, 470 Mass. 201, 215 (2014). Historically we give "wide[, but not unbounded,] latitude to the admission of relevant evidence that a person other than the defendant may have committed the crime." Steadman, supra at 383, quoting Silva-Santiago, supra at 800. Where the evidence is not hearsay, it "must have a rational tendency to prove the issue the defense raises, and the evidence cannot be too remote or speculative." Silva-Santiago, supra at 801, quoting Rosa, supra. "If the evidence is 'of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility.'" Silva-Santiago, supra, quoting Commonwealth v. Conkey, 443 Mass. 60, 66 (2004), S.C., 452 Mass. 1022 (2008).

It was error not to admit Edwards's grand jury statements, particularly his testimony that he was at the shop between 9 A.M. and 9:30 A.M. and that he did not hear any gunshots when he left the shop. As the judge herself put it, "Edwards being a third[-]party culprit [was] very much alive in the case." The Commonwealth conceded that he was present in the rear lot when the victim was shot, at around 12:19 P.M., and the shop video

confirmed that he was in the shop just before the shooting occurred. Therefore, his statements before the grand jury, which were contradicted by the shop video, could have been offered by the defendant as evidence of Edwards's consciousness of guilt. It is of no matter, as was one of the judge's concerns, that one cannot be sure that Edwards was lying, rather than "get[ting] the facts wrong."[22] Because this evidence fairly could support an inference that Edwards, the third-party culprit, lied about being present during the shooting, the defendant should have been able to introduce Edwards's testimony. Cf. Commonwealth v. Phinney, 446 Mass. 155, 165 (2006), S.C., 448 Mass. 621 (2007) (statements made by third-party culprit admissible for nonhearsay purpose to show third-party culprit's state of mind).

We have not addressed squarely whether a defendant may admit statements of a third-party culprit in order to demonstrate the third party's consciousness of guilt. "Evidence of flight, concealment, false statements to police, . . . or similar conduct generally is admissible as some evidence of

_____

[22] The judge also stated, "[W]e can't draw reasonable inferences, it seems to me, about his state of mind. All we can do is talk about what the investigation entailed with respect to him and, at the moment, I'm telling you you're going to be able to do that. You're going to be able to essentially cross-examine Stratton about Edwards. . . . That's distinct from putting before the jury any of the text . . . of his [g]rand [j]ury statements."

consciousness of guilt." Cassidy, 470 Mass. at 217. See Commonwealth v. Fitzpatrick, 463 Mass. 581, 594 (2012) ("jury could have found that the defendant's statements to others, and to police, regarding his whereabouts on the morning of the shootings were wilfully false and consistent with consciousness of guilt"). In Conkey, 443 Mass. at 68-69, we recognized the defendant's showing that a third-party culprit "exhibited consciousness of guilt" in the particular statements that the third-party culprit made. See, e.g., People v. Gonzales, 54 Cal. 4th 1234, 1289 (2012), cert. denied, 568 U.S. 1104 (2013) (codefendant's consciousness of guilt had "relevance to establish her participation in the crime, and to lend some support to defendant's claim that his participation was 'relatively minor'"); State v. Jimenez, 175 N.J. 475, 489 (2003) (third party's anxious conduct is consciousness of guilt only where evidence links him or her to victim). Contrast People v. Hartsch, 49 Cal. 4th 472, 500-501, cert. denied, 562 U.S. 985 (2010) (defendant's proposed instruction that "false or misleading statements by a witness regarding the crimes charged against the defendant could be considered a circumstance tending to prove the witness's guilt" might lead to absurd results if untruthful testimony from any witness could be taken as indication of that witness's guilt); State v. Shannon, 212 Conn. 387, 409, cert. denied, 493 U.S. 980 (1989) (abrogated on other

grounds) ("evidence demonstrating consciousness of guilt is only relevant where the act or statement is that of the <u>defendant</u>").

Considering our case law, we are convinced that, where the admissibility requirements for evidence regarding a potential third-party culprit are met, consciousness of guilt evidence relating to that third-party culprit may be admissible. Here, for reasons stated <u>supra</u>, the grand jury testimony should have been admitted.

We must determine whether the defendant preserved this argument, namely, that the testimony was admissible where he was not offering it for the truth of what Edwards asserted. The vast majority of counsel's objections surrounding the exclusion of Edwards's grand jury testimony were focused solely on its admissibility under <u>Clemente</u> and as an exception to the hearsay rule for prior recorded testimony.[23] On appeal, the defendant

---

[23] In arguing for admissibility of the grand jury testimony, counsel stated: "[T]he Commonwealth called him as a witness in the [g]rand [j]ury. They had full opportunity to question him. So, their rights were preserved, and I think Section B of prior recorded testimony goes right toward[] that"; by calling Edwards to the grand jury, it "was obvious [t]hat [the Commonwealth was] trying to . . . clear him as a suspect"; "I don't think it's hearsay because I'm offering it, and it's sworn testimony, and it's prior recorded testimony. The other reason it comes in . . . , he clearly lied about being at the barbershop . . . , he denied hearing gunshots, and then he testifies about his phone that he wiped clean"; "I have studied <u>Clemente</u>. I think my position is correct on this because he is a third[-]party culprit, and he testified, and the Commonwealth called him to try to clear him"; "in the opening , . . . [the prosecutor] indicated that . . . Edwards came to the police, that he went to

argues that the testimony falls under the Drayton constitutionally based hearsay exception and does not argue that the testimony was nonhearsay as not having been offered for its truth.

If the argument was preserved, "[b]ecause the issue is of constitutional dimension, our review looks to whether the error was harmless beyond a reasonable doubt."  Conkey, 443 Mass. at 70.  If not, where the defendant was convicted of murder in the first degree, we review for a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Upton, 484 Mass. 155, 160 (2020) (we "review raised or preserved issues according to their constitutional or common-law standard and analyze any unraised, unpreserved, or unargued errors, and other errors we discover after a comprehensive review of the entire record, for a substantial likelihood of a miscarriage of justice").

"Only a timely and precise objection to . . . a judge's ruling . . . will preserve a claimed error for appellate review."  Commonwealth v. McDonagh, 480 Mass. 131, 137 (2018).  "We have consistently interpreted Mass. R. Crim. P. 22, 378 Mass. 892 (1979), to preserve appellate rights only when an

_____

the [g]rand [j]ury, . . . I think that is in a way to say to the jury that he had nothing to hide, you know, he didn't do anything wrong.  He cooperated."  The judge responded to this final comment:  "I am not disagreeing with you about the content of . . . Edwards's testimony . . . .  I'm not saying he's a stellar citizen who was being forthright."

objection is made in a form or context that reveals the objection's basis." Commonwealth v. Bonds, 445 Mass. 821, 828 (2006). Where the basis for the defendant's objection differs from the basis asserted on appeal, in a direct appeal from a murder conviction, we review for a substantial likelihood of a miscarriage of justice. Id. at 828-829.

Keeping in mind that "[p]erfection is not the standard by which we measure the adequacy of an objection," we think counsel adequately preserved the argument when he stated, "I think it's prior recorded testimony, and I think it also goes to consciousness of guilt of . . . Edwards. So . . . I think it comes in for evidentiary value." McDonagh, 480 Mass. at 138. Although counsel's objections heavily focused on the testimony being admissible as prior recorded testimony, he repeated his position that Edwards lied to the grand jury and that it was crucial for the jury to hear the testimony in order to assess Edwards's capacity as a potential third-party culprit.[24] Id., quoting Commonwealth v. Fowler, 431 Mass. 30, 41 n.19 (2000) ("An objection adequately preserves the claimed error so long as 'counsel "makes known to the court the action which he desires the court to take or his objection to the action of the

---

[24] Similarly, appellate counsel emphasized that Edwards's grand jury testimony was "critical evidence" in support of the defendant's third-party culprit defense and that it called into question Edwards's credibility.

court"'"). Because that is the precise reason the failure to admit the evidence was error, the objection sufficiently was preserved. We review to determine whether the error was "harmless beyond a reasonable doubt." Conkey, 443 Mass. at 70.

"The 'essential question' in analyzing harmlessness beyond a reasonable doubt is 'whether the error had, or might have had, an effect on the [fact finder] and whether the error contributed to or might have contributed to the [findings of guilty].'" Commonwealth v. Vasquez, 456 Mass. 350, 360 (2010), quoting Commonwealth v. Perrot, 407 Mass. 539, 549 (1990). As a reviewing appellate court, we must be satisfied, based on the totality of the record, "weighing the properly admitted and the improperly [un]admitted evidence together, . . . beyond a reasonable doubt that the [lack of admission of the evidence] did not have an effect on the [fact finder] and did not contribute to the [fact finder's findings].'" Vasquez, supra, quoting Commonwealth v. Tyree, 455 Mass. 676, 701 (2010).

In the context of improperly admitted evidence, we have said that relevant factors to consider in determining whether an error is harmless beyond a reasonable doubt include "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative

instructions." Commonwealth v. McNulty, 458 Mass. 305, 320 (2010), quoting Commonwealth v. Mahdi, 388 Mass. 679, 696-697 (1983). Although not all these factors are relevant for evidence offered by the defendant that wrongfully was excluded, rather than improperly admitted, the first, second, and third factors remain important to consider.

In Conkey, 443 Mass. at 70, we held that the exclusion of evidence of a potential third-party culprit's prior incidents of sexual assault was not harmless beyond a reasonable doubt, "[g]iven the importance of the evidence to the defense's third-party culprit theory." In Commonwealth v. Gray, 463 Mass. 731, 746-750 (2012), we concluded that precluding the defendant from impeaching a declarant's hearsay statement identifying the defendant with his grand jury testimony that he did not recognize the shooter was not harmless beyond a reasonable doubt. The declarant was unavailable at trial, and his statements prior to the grand jury identifying the defendant were admitted through other witnesses. Id. at 747-748. Where "[i]dentification of the shooter was the key issue at trial, and misidentification was the theory of the defense," the identification of the defendant as the shooter at trial "was somewhat uncertain," the prosecutor "relied heavily on [the declarant's] reported statement," and the jury asked a question about the declarant's reported statement during deliberations, a

new trial was required.  Id. at 749-750.  See Feaster v. United States, 631 A.2d 400, 410-411 (D.C. 1993) (error in excluding grand jury testimony of witness not harmless where it may have caused jury "which rejected or could not agree on some of the complainants' allegations" to reject more or all allegations).

Similarly, here, that Edwards was the shooter rather than the defendant was the central claim of the defense.  Although the jury heard extensive testimony regarding Edwards's potential identification as a third-party culprit, they did not hear any evidence that something Edwards said in the context of the investigation, specifically regarding his presence at the scene of the crime, was demonstrably false.  Edwards incorrectly told the grand jury that he was at the shop between 9 A.M. and 9:30 A.M.  As the shop video demonstrated, Edwards was actually present at 12:17 P.M., within two minutes before the victim was killed.  This would have strengthened the defendant's argument that Edwards was the shooter, by supporting an inference of Edwards's consciousness of guilt.

We recognize that some evidence of Edwards's consciousness of guilt was presented to the jury, i.e., they heard that he deleted much of the data on his cell phone before relinquishing it to police.[25]  Further, there was no dispute that Edwards was

---

[25] The jury were free to reject Edwards's excuse for the deletion as his position as a marijuana dealer.

present at the scene of the murder.  The Commonwealth admitted in its opening statement that one set of feet in the corner of the video walking away from the crime scene belonged to Edwards. The jury heard from the barbers, and saw from the video, that Edwards was present in the shop just under two minutes before the victim was killed, briefly looked at the victim, and departed from the shop while using his cell phone.  It was established that Edwards lived right near the rear lot of the shop where one could access the parking lot by jumping over a damaged fence.  The jury heard that a person with a red shirt was walking from behind the shop onto Landor Road and then onto Blue Hill Avenue within a minute of the gunshots.  In addition to the consciousness of guilt evidence that Edwards deleted a significant amount of data on his cell phone before providing it to police, the jury heard that Edwards could not produce a telephone number for Taj, the person he allegedly was speaking to when he left the shop.  There was evidence presented that an individual with the same byname as Edwards attempted to discard a bloody shirt after the murder.

In closing argument, counsel was able to marshal this evidence to argue forcefully that Edwards was the killer.  He argued that Edwards, who was not known to the barbers, went into the shop with the sole purpose of marking the victim to be killed, and departed through the woods back to his house.  He

asked the jury to consider why else Edwards would have deleted the data on his cell phone, and why else police were looking for a bloody shirt on Morton Street. Despite the lack of evidence supporting it at trial, counsel even told the jury that Edwards said he was not there for the shooting.

Nonetheless, it is impossible to determine whether evidence supporting an inference that Edwards was not forthcoming about his presence at the shop within two minutes of the victim's murder would have tipped the scales in favor of the defendant, particularly where his third-party culprit argument was so well presented. The Commonwealth was able to present evidence that Edwards turned himself over to police in response to the BRIC flyer and willingly gave police his cell phone. In turn, counsel should have been able to present evidence supporting an argument that Edwards may not have been as forthcoming as he appeared. Where Edwards was at the center of the trial, we cannot say that this error was harmless beyond a reasonable doubt.

Because the defendant's convictions of unlawful carrying of a firearm without a firearm identification card, unlawful possession of ammunition without a firearm identification card, and unlawful carrying of a loaded firearm without a license are intertwined with the conclusion that he shot the victim, as there was no separate evidence presented regarding the

defendant's possession of a firearm or ammunition, we must also reverse those convictions. Cf. Commonwealth v. Dias, 405 Mass. 131, 132 n.2 (1989) ("[s]ince the indictments for burglary and armed assault . . . were closely tied to the murder . . . and since the jury improperly were allowed to consider the statements of the other defendant in deciding each defendant's case, we conclude that the error related to both crimes and that there must be a new trial as to each").

In Commonwealth v. Guardado, 491 Mass. 666, 690, 693 (2023) (Guardado I), we held that to convict a defendant of unlawful possession of a firearm and unlawful possession of ammunition, "the Commonwealth must prove 'as an element of the crime charged' that the defendant in fact failed to comply with the licensing requirements" (citation omitted). Although we did not reach the issue whether the absence of licensure is an essential element of the crime of unlawful possession of a large capacity feeding device, Guardado I, supra at 693 n.10, we think that our decision in Guardado I must be applied to G. L. c. 269, § 10 (n), as charged here, where it is an extension of a crime under G. L. c. 269, § 10 (a). See G. L. c. 269, § 10 (n) ("Whoever violates paragraph [a] . . . by means of a loaded firearm . . . shall be further punished by imprisonment in the house of correction for not more than [two and one-half] years, which sentence shall begin from and after the expiration of the

sentence for the violation of paragraph [a] . . ."). See also Guardado I, supra at 693 ("our holding applies prospectively and to those cases that were active or pending on direct review as of the date of the issuance of [New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022)]"). Consistent with our subsequent decision in Guardado II, 493 Mass. 1, the Commonwealth may retry the defendant on the firearms offenses, id. at 7, quoting Commonwealth v. Hebb, 477 Mass. 409, 413 (2017) ("A new trial is warranted so that the Commonwealth may have 'one complete opportunity to convict' the defendant under the new law").

We reverse and remand for a new trial in which the defendant is permitted to introduce Edwards's grand jury testimony. We address the remainder of the defendant's arguments as they may arise at a new trial.

c. Stratton testimony regarding video. The defendant argues that Stratton's narration of what was happening in the videos and who he believed to be on the videos was inadmissible and prejudicial evidence. The Commonwealth argues that Stratton's testimony about his personal observations of the videos was relevant and admissible evidence, not used to identify the defendant, and an appropriate response to the defendant's Bowden argument.

"Making a determination of the identity of a person from a photograph or video image is an expression of an opinion." Commonwealth v. Wardsworth, 482 Mass. 454, 475 (2019), quoting Commonwealth v. Pina, 481 Mass. 413, 429 (2019).  "A lay opinion . . . is admissible only where it is '(a) rationally based on the perception of the witness; (b) helpful to . . . the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge.'" Commonwealth v. Grier, 490 Mass. 455, 476 (2022), quoting Commonwealth v. Canty, 466 Mass. 535, 541 (2013).  Where the jury are capable of viewing a video and drawing their own conclusions about the depictions within it, "a lay witness's testimony about the content of the video or photographs is admissible only if it would assist the jury in reaching more reliable conclusions."  Grier, supra.  Where a defendant raises a Bowden defense, the Commonwealth is permitted to elicit testimony explaining "why the investigators chose the particular investigative path they did."  Commonwealth v. Avila, 454 Mass. 744, 754-755 (2009).

Stratton testified about his observations of several videos.  He pointed out the movements of a particular car on which he focused in several videos, which he believed to be a

black Toyota Camry.[26]  Stratton stated that, on the video, he saw a man get out of the car, walk toward the area of the back of the shop minutes before the shooting, and return to the car and drive away after the shooting.  He testified at several points that one can observe the defendant walking in and out of view in the shop video.  He also testified that before he saw the defendant walk into the shop for the first time, he identified him on the ice cream shop video.

The defendant objected when Stratton identified someone in the video as Menzie.[27]  Counsel stated, "[F]or the record, I do not believe this detective should be able to look at [the] video and say what he sees. . . .  [T]hat's for the jury to determine."  The judge agreed with counsel, sustained the objection, and instructed the jury:

> "[J]urors, let me just make clear for your purposes . . . [t]here's obviously a big difference between what you see on a video and what someone else tells you they saw on a video, right?

> "As for all evidence in a jury trial, it is for you to determine what you see and what significance, if any, what

---

[26] Counsel objected to Stratton's identification of the car as a black Toyota Camry, stating that the video "speaks for itself."  The judge instructed the Commonwealth to "separate his state of mind and his investigation from what's on the video itself, which is up to the jury to decide."

[27] Later in his testimony, Stratton explained why he believed another individual in a red shirt walking on Landor Street in the direction of Blue Hill Avenue was Lewis based on the clothing he was wearing and the timing of his exit in the shop video.

you see has to you.  The same way you listen to testimony of a witness and decide what significance, if any, that testimony has to you.

"On the other hand, this witness conducted an investigation.  It's fair for the Commonwealth to ask him why he did what he did and what conclusions he drew from what he did, but that's the distinction.  Whether it's video or anything else, his state of mind, his decision making, his conclusions are fair game for him to tell you about.  It's for you to decide, as with everything else in this case, . . . whether you believe any of the testimony of any witness, whether you believe anything you see on a video, just like anything you see on a document, and if so, what weight or significance to give it in the context of all the evidence in the case. . . .

"The Commonwealth is going to make an effort to distinguish better in the questions between what this witness is seeing or concluding and your part of the job, which is always the same, which is to decide what you see and what you conclude."

On cross-examination, counsel asked Stratton whether he saw Edwards in the shop video and what he saw him doing.  Counsel played the shop video during his cross-examination, asked Stratton whether he saw the defendant and the victim walking out the door of the shop, and also asked him about his testimony before the grand jury that the victim and defendant were having a "tussle."  He also asked Stratton whether Stratton saw Edwards standing in the upper part of the screen, with "a black item in his hand."  On redirect examination, the Commonwealth elicited testimony from Stratton regarding the shop video that he believed he saw the victim punch the defendant, causing the defendant to go off screen, and then saw the victim retreating

back to the door.  He testified that, in his opinion, the defendant reappeared in the frame with his left hand down by his side and what appeared to be a black item in his left hand. When Stratton stated that the black item counsel suggested Edwards was holding was a milk crate, counsel objected, and his objection was overruled.  On recross-examination, counsel again asked Stratton if he saw the defendant walk out of the door to the shop with the victim, and where he saw Edwards standing in the video.

Although counsel may not have objected to every statement by Stratton characterizing the video, and in fact elicited several, reviewing Stratton's opinion evidence for error, we find none.  See Grier, 490 Mass. at 476.

Stratton's testimony regarding the movements of the black car was properly admitted to assist the jury in focusing their attention to relevant areas in the video, and to orient the jury to the streets and the areas in which the car was traveling. See Grier, 490 Mass. at 476 ("While the jurors could see for themselves that the still image depicted a scene with two individuals crossing a street, [officer] was providing context that would allow the jurors to better situate the scene and the individuals depicted in it").  Stratton's identification of the driver of the black car as wearing a red burgundy-type colored shirt "consistent in color to the one that [the defendant] was

wearing" was properly admitted to explain why police focused on the defendant in the investigation (as opposed to Edwards). See Avila, 454 Mass. at 755 (in response to Bowden defense, officers permitted to testify why they acted on "information that the defendant was the person who shot the victim").

Stratton's repeated identification of the defendant in the shop video was not error in these circumstances. First, although the identifications of the defendant were not brief, they became pervasive only once counsel began to ask Stratton on cross-examination what exactly he saw in the video. Indeed, counsel himself acknowledged in his questioning that one of the individuals portrayed in the shop video was the defendant, and he elicited testimony about the physical altercation that Stratton believed occurred between the defendant and the victim. See Grier, 490 Mass. at 476 (no prejudice where counsel conceded defendant was walking in area of shooting moments before shooting). Second, unlike in Wardsworth, the defendant meaningfully raised not only a Bowden argument, but also a third-party culprit argument.[28] Stratton's testimony was

---

[28] Although the judge did not give a Bowden jury instruction, the defense forcefully argued that police made missteps during their investigation in closing.

Before Stratton testified, the judge already had ruled that, where the defendant was raising a Bowden defense, counsel could cross-examine Stratton about Edwards being a third-party culprit and that the Commonwealth could "tell us everything

appropriate to explain why investigators focused on the
defendant, rather than Edwards, whom Stratton also identified as
being in the video.[29]  Contrast Wardsworth, 482 Mass. at 478 ("It
is not clear that a Bowden defense was meaningfully raised.  In
any event, the judge did not instruct the jury that the
officers' identification testimony was admissible only for the
limited purpose of rebutting a Bowden argument").  Third, the
judge gave a forceful instruction to the jury during the
testimony, which emphasized that Stratton's testimony was for
the purpose of helping the jury understand why police made
certain investigatory decisions and that it was the jury's job
to decide what they saw in the video.  This was accentuated by
both the prosecutor and counsel in closing when they both told
the jury to watch the video, and that they "decide what
happened," and when the judge instructed the jury that they were

---

about the investigation."  Admitting that a Bowden defense "does
not provide carte blanche to introduce all conceivable rebuttal
evidence," the Commonwealth did not cross the line here.
Commonwealth v. Wardsworth, 482 Mass. 454, 478 (2019).

[29] The prosecutor's question to Stratton, "[D]o you attempt
to locate the vehicle that you believe the defendant was
driving?" which elicited an affirmative response, also was not
error.  See Commonwealth v. Chhoeut Chin, 97 Mass. App. Ct. 188,
204-205 (2020) (not error to admit detectives' testimony
identifying car in video as defendant's car where they recounted
their personal observations of defendant's car with personal
observations of what they saw in video).  This was permissible
to explain further Stratton's focus on the car in the video in
relation to his investigation.

the "sole and exclusive judges of the facts."[30]  See Commonwealth

v. Chhoeut Chin, 97 Mass. App. Ct. 188, 205 (2020) (no error

where, in addition to other factors, "judge properly instructed

the jury that the officers' observations should not override the

jurors' own observations if they were at odds").

d.  Ineffective assistance of counsel.  In his motion for a

new trial, the defendant argued that counsel was ineffective by

(1) "diminishing his credibility" with the jury by erroneously

suggesting that the video depicted Edwards with a firearm in his

hand, and (2) failing to object when Stratton identified

individuals and opined on activity depicted on the video.  He

reiterates these claims on appeal.

"Because the defendant has been convicted of murder in the

first degree, we examine his claims of ineffective assistance of

counsel under the rubric of [§ 33E] 'to determine whether there

exists a substantial likelihood of a miscarriage of justice,'" a

standard more favorable than the general constitutional standard

for ineffective assistance.  Commonwealth v. Facella, 478 Mass.

393, 409 (2017).  "[W]e determine whether there was an error in

the course of the trial by defense counsel (or the prosecutor or

---

[30] The judge's seemingly mistaken failure to instruct the
jury in her final charge with respect to factual determinations
of what is depicted in a video does not alter our conclusion,
particularly where counsel indicated that he was content with
the jury instructions.

the judge) 'and, if there was, whether that error was likely to have influenced the jury's conclusion.'" Commonwealth v. Kolenovic, 478 Mass. 189, 193 (2017), quoting Commonwealth v. Gulla, 476 Mass. 743, 746 (2017). Strategic decisions made by trial counsel will not be deemed ineffective assistance unless they are "manifestly unreasonable" (citation omitted). Commonwealth v. Alvarez, 433 Mass. 93, 102 (2000). Counsel made no such error here.

First, with respect to counsel's suggestion that Edwards was holding a black item in his hand in the video, counsel properly was marshalling the evidence to point to his theory of the case that Edwards was the shooter. On cross-examination, counsel showed Stratton a segment of the video depicting the individual alleged to be Edwards in the upper right part of the screen and asked Stratton if he saw that person holding a "black item in his hand, pointing it." Stratton acknowledged the individual wearing a red shirt and likely jeans, but denied that the individual was holding a black item, and instead suggested that it was something in the foreground. On redirect, the Commonwealth elicited that the black item may have been milk crates that were in the area before and after the shooting, and that the defendant appeared to be holding a black item to his side.

As mentioned supra, the quality of the shop video was less than clear -- particularly the portion depicting the rear of the shop. The Commonwealth admitted in its opening that "at a first glance, it's going to be very difficult for you to see that video." Each side, however, told the jury that the video was the key piece of evidence in the case and that the jury would have to study it carefully in order to decide what happened. In fact, counsel stated in his opening that the video was "the most important part of this case." Where what happened in the back of the shop from the vantage point of the video was somewhat open to interpretation due to its quality, counsel was wise to ask questions of Stratton that may have elicited evidence supporting his theory that Edwards could have been the shooter, because he might have been holding a gun. That suggestion was not so far-fetched that it risked giving the jury "the impression that counsel was trying to trick them." We agree with the motion judge, who also was the trial judge, that there was "no manifestly unreasonable mistake" in counsel's question to Stratton. See Commonwealth v. Yat Fung Ng, 489 Mass. 242, 252-253 (2022), S.C., 491 Mass. 247 (2023) ("any loss of credibility suffered as a result of trial counsel's [line of questioning] did not . . . deprive the defendant of an available ground of defense"); Facella, 478 Mass. at 412 ("typically we do

not characterize strategic decisions as ineffective assistance merely because they prove unsuccessful").[31]

Second, with respect to Stratton's testimony regarding the video evidence, because the admission of such testimony was not prejudicial error, as discussed supra, any failure of counsel to object to any particular portion was not "likely to have influenced the jury's conclusion." Kolenovic, 478 Mass. at 193, quoting Gulla, 476 Mass. at 746. Counsel objected numerous times, once resulting in a thorough instruction from the judge that the jury were to determine on their own what was depicted in the video. Again, there was no dispute as to the defendant's identity on the shop video -- he readily admitted that he was at the shop and interacting with the victim at the time of the shooting. See Commonwealth v. Diaz, 448 Mass. 286, 293 (2007) ("the mere fact that [counsel] interposed objections on grounds that were unsuccessful does not demonstrate ineffective assistance").

---

[31] To the extent that counsel, in his affidavit, claimed lack of strategic reasons or lack of due diligence for his alleged errors, the judge "decline[d] to credit these assertions." We see no abuse of discretion in this decision. See Commonwealth v. Moore, 489 Mass. 735, 744 (2022) ("Because the motion judge was also the trial judge, we extend '"special deference" to the judge's findings of fact and the ultimate decision on the motion' for a new trial" [citation omitted]); Commonwealth v. Vaughn, 471 Mass. 398, 405 (2015) ("the credibility, weight, and impact of the affidavits are entirely within the motion judge's discretion").

3. <u>Conclusion</u>.  For the foregoing reasons, we conclude that it was error to exclude Edwards's grand jury testimony and that such error was not harmless beyond a reasonable doubt. Because the firearms charges were intertwined with the defendant's murder conviction, those convictions also must be reversed.  We therefore reverse and remand for a new trial on all charges.

<u>So ordered</u>.